

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IRSHAD LEARNING CENTER,      )
                             )
            Plaintiff,       )
                             )
      v.                     )      No. 10 CV 2168
                             )
COUNTY OF DUPAGE,            )      Judge Rebecca R. Pallmeyer
                             )
            Defendant.       )

## MEMORANDUM OPINION AND ORDER

Plaintiff Irshad Learning Center, a Muslim religious and educational group, seeks a Conditional Use Permit to use property in unincorporated DuPage County for religious services and educational purposes. DuPage officials have denied the request. In this lawsuit, Plaintiff alleges that the denial violates its rights under the United States Constitution, the Illinois Constitution, and the Religious Land Use and Institutionalized Persons Act. Defendant has moved for summary judgment on all Counts [77]. Plaintiff has moved for summary judgment on Counts II, III, VII, IX, and X [81]. For the reasons set forth below, the motions are granted in part and denied in part.

## BACKGROUND

The following facts are drawn from the pleadings and the parties' Local Rule 56.1 submissions. Irshad Learning Center (hereinafter "ILC" or "Plaintiff") is a religious institution incorporated under the Illinois Not-For-Profit Corporation Act. (Pl.'s 56.1 Resp. [96], ¶ 3.) ILC currently conducts a Thursday evening prayer service at College of DuPage facilities and a Saturday afternoon youth education session at the Islamic Foundation School of Villa Park, also located in DuPage County. (Id. ¶¶ 3-6.) ILC also conducts services on religious holidays and other events. (Def.'s 56.1 Resp. [100], ¶ 2.) ILC's activities are conducted at rented spaces at the Steeple Run Center, the Islamic Foundation School in Villa Park, the College of DuPage, a church in Woodridge, and a community center in Des Plaines. (Pl.'s 56.1 Stmt. [83], ¶ 6.) Most of ILC's

members reside in DuPage County and are of Iranian origin and/or descent. (*Id.* ¶¶ 1-2.) In March 2008, ILC purchased the property located at 25W030 75th Street, unincorporated Naperville, DuPage County, Illinois, which is the subject of this suit. (Pl.'s 56.1 Resp. ¶ 3.)

**ILC's Property Search**

ILC began its search for a suitable location at which to permanently conduct its regular activities in 2003. (Pl.'s 56.1 Stmt. ¶ 6.) Between 2003 and 2008, ILC made unsuccessful offers to purchase four other properties, including a church in Schaumburg and another church in unincorporated DuPage County. (Pl.'s 56.1 Stmt. ¶ 7; Pl.'s 56.1 Resp. ¶¶ 12, 16.) At some point, ILC purchased a property in Lisle, Illinois, which is also located in DuPage County, on which it initially intended to construct a new structure for its activities.[1] (Pl.'s 56.1 Stmt. ¶ 7; Pl.'s 56.1 Resp. ¶ 15.) ILC later decided to sell that property, claiming that it lacked the funds to build a new structure at that location, and instead sought to purchase a property with an existing structure. (Pl.'s 56.1 Stmt. ¶ 7; Pl.'s 56.1 Resp. ¶ 15.) In March 2008, ILC's search for a permanent home appeared to have ended when it purchased the subject property. (Pl.'s 56.1 Resp. ¶ 8.)

**ILC's Property**

ILC's property is a 2.9-acre improved parcel located in unincorporated Naperville, DuPage County, Illinois. (Pl.'s 56.1 Stmt. ¶ 9; Pl.'s 56.1 Resp. ¶ 3.) The main structure on the property is a large single-family residence that was converted by its previous owner into a private school. (Irshad Learning Center Zoning Request [86-5] (hereinafter "Zoning Request"), Ex. A to 12/10/08 ILC Zoning Application [(hereinafter "Zoning Application"), Ex. EE to Pl.'s Mot. for Summ. J. [81] (hereinafter "Pl.'s Mot."), at 2.) An aerial photograph of the property and the surrounding area, and a site plan overlay are attached as Appendices A and B to this opinion respectively.[2] As the map

---

[1]     The record does not reflect when the Lisle property was purchased.

[2]     *See* Oblique Aerial View [87-9], Ex. 2 to Maiden Report, Ex. HHH to Pl.'s Mot.;
                                                                            (continued...)

and site plan depict, the property fronts the north side of 75th Street, which is a four-lane divided highway. (*Id.*)  The property is bordered on the north by Fox Meadows, a single family residential subdivision.  (Pl.'s 56.1 Stmt. ¶ 10.)  West of the property is also the Fox Meadows residential subdivision, beyond which is the Fox Run Square Shopping Center, which houses Dominick's Fine Foods, Blockbuster, Ace Hardware, and other retailers.  (*Id.*)  To the east of the property is a single family home which also fronts 75th Street, and further east on the north side of 75th Street is the Peter Pan Early Learning Center.  (*Id.*)  South of 75th Street are the New Day Montessori School and single family homes.  (*Id.*)

ILC's property directly adjoins improved parcels containing single family residences along its western, northern and eastern property lines.  (Pl.'s 56.1 Resp. ¶ 18.)  The parcels along its western and northern property lines are zoned residential under the City of Naperville's Zoning Ordinance, and the unincorporated parcel immediately adjacent on the east is zoned R-1 (single-family residential) under the County's Zoning Ordinance.  (*Id.* ¶ 19.)  The only vehicular access to the property is from the outside west-bound lane of 75th Street.  According to 2007 Illinois Department of Transportation traffic counts, 75th Street served an average of 35,600 vehicles daily.  (Zoning Request at 2.)  During the last year in which the County collected traffic volume data, 2006, the highest volume of traffic on 75th Street adjacent to the Subject Property occurred between 5:00 p.m. and 6:00 p.m., Monday through Friday.  (Pl.'s 56.1 Stmt. ¶ 11; Def.'s Resp. to Pl.'s Request for Admission [85-20], Ex. X to Pl.'s Mot., ¶ 12.)

**The Balkwill School**

The previous owners of the property, the Balkwill Family, purchased the property in 1994 and began operating a private school on the property the same year.  (Pl.'s 56.1 Stmt. ¶ 9.)  In 2006, the DuPage County Board granted the Balkwills a Conditional Use Permit (the "Balkwill

---

[2](...continued)
Alterative Site Plan Overlay [87-9], Ex. 5 to Maiden Report.

Permit" or "Balkwill Ordinance") to use the property for a private school. (*Id.* ¶ 17.) The Balkwill Permit allowed for enrollment of sixty-five children, ages 3 to 12, and at least five additional adults, including two staff, to participate in daily school activities. (Pl.'s 56.1 Stmt. ¶ 17; Balkwill Ordinance [86-3], Ex. CC to to Pl.'s Mot., at 2.) The Permit also permitted three residents. (Pl.'s 56.1 Stmt. ¶ 17.) The Balkwill Permit was first considered at a Zoning Board of Appeals ("ZBA") public hearing on November 10, 2005 and was recommended for approval by the ZBA on December 19, 2005. (*Id.*) The permit was ultimately granted on January 10, 2006. (*Id.*) The Balkwill School's hours of operation were limited by the Conditional Use Ordinance to 7:30 a.m. to 12:30 p.m., Monday through Friday. (*Id.*) The Balkwill School was not authorized to conduct activities after 12:30 p.m. on weekdays or anytime on the weekends. (Pl.'s 56.1 Resp. ¶ 27.) There are seven paved parking spaces located in front of the main structure which were used by the Balkwill School. (Pl.'s 56.1 Resp. ¶ 28; Site Plan [86-7], Ex. GG to Pl.'s Mot.) Neither party disputes that ILC may use the property under the exact same conditions that the DuPage County Board approved for the Balkwill School. (Def.'s Mem. in Supp. of Mot. for Summ. J. [78] (hereinafter "Def.'s Mem."), at 15; *see* Balkwill Ordinance [listing conditions upon which the Conditional Use was approved and including a site plan of the property to which the Balkwill School was required to adhere].)

**Zoning Regulations and Procedures**

Pursuant to the authority granted by the Illinois General Assembly, including 55 ILCS 5/5-12001, *et seq.*, the County Board adopted the DuPage County Zoning Ordinance, codified at Chapter 37 of the DuPage County Code. (DuPage County Zoning Ordinance [79-1] (hereinafter "County Zoning Ordinance"), Ex. A-1 to Def.'s 56.1 Stmt. [79].) The County Zoning Ordinance divides the unincorporated area of the County into several zoning districts and, for each district, identifies each allowed land use as either a "Permitted Use" or "Conditional Use." (County Zoning Ordinance §§ 37-700.1 & .2) Sections 37-700.1 and .2, which are applicable to residential zoning

4

districts only, provide that a "Permitted Use" may exist as of right within a zoning district, while a "Conditional Use" must be authorized as set forth in Section 37-1413. (Id.)

ILC's property is designated an R-1 Zoning District (single-family residential), which authorizes the operation of religious institutions with a Conditional Use Permit. (Pl.'s 56.1 Stmt. ¶ 16.) Although the County Zoning Ordinance does not specifically define "religious institutions," the Zoning Ordinance identifies "chapels, churches, synagogues, temples and other religious institutions including parsonages and rectories" as Conditional Uses in the several residential zoning districts, including the R-1 district. (County Zoning Ordinance § 37-701.2 [79-1], Ex. A-2 to Def.'s 56.1 Stmt.) The above-described classification was adopted by the County Board as part of a 1985 comprehensive text amendment. (Def.'s 56.1 Stmt. ¶ 8.) Prior to that text amendment, chapels, churches, synagogues, temples and other religious institutions, including parsonages and rectories, were permitted as of right in the residential zoning districts. (Id.)

Zoning proceedings in DuPage County involve four different entities: the Department of Economic Development and Planning ("Planning Department"); the Zoning Board of Appeals[3] ("ZBA"); the County Development Committee[4] ("CDC") of the County Board; and the County Board. Those seeking zoning relief must first file their application with the Zoning Board of Appeals.[5]

_____

[3]     Although officially titled the "Zoning Board of Appeals," the ZBA handles both original zoning applications as well as appeals.  Members of the ZBA are appointed by the County Chairman with the advice and consent of the County Board.

[4]     All members of the CDC are also members of the County Board.

[5]     Neither side has provided a comprehensive outline of the zoning review procedures. Defendant includes portions of the DuPage County Zoning Ordinance in the record as Exhibit A [79-1] to its Rule 56.1 statement of Facts, and Plaintiff includes portions of the Zoning Ordinance as Exhibits Y [85-21], Z [85-22], and AA [86-1], and the ZBA Rules of Procedure as Exhibit BB [86-2], to its motion for summary judgment.  The court has found additional sources, including the Zoning Procedures document, helpful in explaining DuPage County's zoning procedures, at least as they exist today. See "DuPage County Zoning Board of Appeals Application and Procedure," available online at http://www.dupageco.org/EDP/Zoning/Docs/18586/ (visited Mar. 4, 2013) (hereinafter "Zoning Procedures").

Zoning staff may assist an applicant in completing his/her application, and will advise applicants of the "requirements and standards for zoning relief." (Zoning Procedures at 1.) The ZBA then schedules a public hearing on the proposed application at which the petitioner or an agent must present testimony concerning the proposed zoning relief. (*Id.* at 4.) The public hearing must begin no later than sixty days, and must conclude no later than 120 days, after the application is submitted, with some enumerated exceptions. (DuPage County Code 37-1415.A.) Questions may be directed at the petitioner from zoning staff, ZBA members, and members of the public. (Zoning Procedures at 4.) The ZBA then makes a recommendation on the application to the County Development Committee, and the County Development Committee makes a recommendation to the County Board, which renders a final decision. (*Id.*) The CDC may also opt to remand a petition to the ZBA "for reconsideration of its vote where significant new information has been made available." (*Id.* at 13.)

Pursuant to 55 ILCS 5/5-12009.5, a Conditional Use may only be granted after a public hearing is conducted before the ZBA. The standards for a Conditional Use outlined in Section 37-1413 are as follows:

A.      That the granting of any conditional use is in harmony with the general purpose and intent of this chapter, and will not be injurious to the neighborhood, detrimental to the public welfare, or in conflict with the County's Comprehensive Plan for development; and specifically that the granting of the conditional use will not:

1.      Impair an adequate supply of light and air to adjacent property;

2.      Increase the hazard from fire or other dangers to said property;

3.      Diminish the value of land and buildings in the vicinity of the proposed conditional use;

4.      Unduly increase traffic congestion in the public streets and highways;

5.  Increase the potential for flood damages to adjacent property;

6.  Incur additional public expense for fire protection, rescue or relief; or

7.  Otherwise impair the public health, safety, comfort, morals or general welfare of the inhabitants of DuPage County, nor will it otherwise create a nuisance.

(County Zoning Ordinance § 37-1413.A [79-1], Ex. A-4 to Def.'s 56.1 Stmt.) Section 37-1415 of

the County Zoning Ordinance provides for "public hearings" to gather evidence and hear testimony

concerning each applicant's (petitioner's) request for zoning relief, including "Conditional Use"

petitions. (County Zoning Ordinance § 37-1415 [79-1], Ex. A-5 to Def.'s 56.1 Stmt.)

**Plaintiff's Conditional Use Application**

Plaintiff first filed a Conditional Use Application for use of the property as a "learning center"

on August 19, 2008, without the assistance of counsel. (Pl.'s 56.1 Stmt. ¶ 23; Def.'s 56.1 Stmt.

¶ 29.) Plaintiff later retained counsel, and the "learning center" application was withdrawn at a

November 20, 2008 ZBA public hearing. (Pl.'s 56.1 Resp. ¶ 30.)

On December 10, 2008, Plaintiff re-applied for zoning approval through its zoning attorney

for an R-1 Conditional Use to operate a "religious institution." (Pl.'s 56.1 Resp. ¶ 31.) ILC's

Conditional Use Application and Exhibit A thereto, a document entitled "Irshad Learning Center

Zoning Request" (collectively the "Application" or "Petition"), describes the property and ILC's

proposed use. The Application requested use of the existing structures to hold religious services

on Thursday evenings. (Zoning Request at 2.) These services were to begin at sunset, but no

earlier than 6:00 p.m., and to end three hours later. (*Id*.) ILC also sought to conduct religious

education classes for fifty-five students on Saturdays from 11:00 a.m. to 4:00 p.m. (*Id*.)

The Application proposed a 100-person maximum occupancy for the main worship area.

(Zoning Request at 3.) The Application stated that ILC did not anticipate membership to grow

beyond the seventy-five members it claimed to have at the time, and stated that approximately seventy people would occupy the property during ILC's peak usage. (Zoning Request at 3; Pl.'s 56.1 Resp. ¶ 32.) The Application also called for twenty-seven parking spaces in front of the main building as well as twelve "banked" spaces in the west yard to be built if the twenty-seven proposed spaces were insufficient. (Zoning Request at 3.)

Prior to the first ZBA public hearing on ILC's submissions, ILC hosted meetings for neighboring residents on November 18, 2008 and January 13, 2009, during which ILC's directors and trustees presented information regarding ILC's proposed use of the property. (Pl.'s 56.1 Resp. ¶ 35.) In a letter to Paul Hoss of the DuPage County Department of Zoning and Planning, ILC's zoning attorney explained that the November meeting was a broad discussion, airing neighbors' basic questions regarding what ILC was as well as its goals for the property. (Jan. 14, 2009 Letter to Paul Hoss at 1 [79-20], Ex. N to Def.'s 56.1 Stmt.) Questions regarding lighting and noise were also addressed at this first meeting. (Id.) At the January meeting, the neighbors had an opportunity to review ILC's Application and the other documents ILC submitted to the ZBA in December. (Id.) Discussions at the January meeting focused on lighting, noise, and garbage storage related to ILC's proposed use. (Id.) ILC's counsel reported that neighbors also expressed concerns that future expansion by ILC would negatively affect property values. (Id. at 1-2.)

**February 26, 2009 ZBA Hearing**

On February 26, 2009, the DuPage County Zoning Board of Appeals held its first public hearing on ILC's Application. (Pl.'s 56.1 Stmt. ¶ 34; Pl.'s 56.1 Resp. ¶ 36.) ILC's zoning attorney, Scott Day, presented the ZBA with the Application and other supporting documents. (Feb. 26, 2009 ZBA Hr'g Tr. [86-8], Ex. HH to Pl.'s Mot., at 5-6; Pl.'s 56.1 Stmt. ¶ 34.) Several representatives of ILC were also present at the hearing, but Day informed the ZBA that the

representatives would not testify unless the Board had questions for them. (Feb. 26, 2009 ZBA Hr'g Tr. at 5.) The ILC representatives were sworn in but were never questioned. (*Id.* at 9.)

Day presented testimony on behalf of ILC, describing the organization and its proposed use of the property. Day's testimony was consistent with, and largely duplicative of, the information provided in ILC's Application and the supporting documents. (*See Id.* at 5-35.) According to Day, ILC was composed of approximately twenty-five families, and the organization did not expect significant membership growth. (*Id.* at 23.) Day testified that ILC's proposed use for the property included Thursday services open to all members that would start at sunset, but no earlier than 6:00 p.m., and end by 10:30 p.m. (*Id.* at 24.) ILC also intended to conduct religious education classes for approximately eighty-five children from 11:00 a.m. to 4:00 p.m. on Saturdays. (*Id.* at 25.) Day testified that, in addition to these regular activities, ILC would conduct occasional "religious holiday events." (*Id.*) The dates of these events would change each year, based on the religious calendar. (*Id.*) These holiday events would include Ramadan services, which, as Day explained, would consist of five to ten consecutive evening services, shorter than the regular Thursday evening services. (*Id.* at 26.) Day also testified that ILC sought to hold "special events," which would include regular services associated with events such as weddings, funerals, and congregational meetings. (*Id.* at 26-27.) ILC had held approximately twenty to twenty-five such special events each year over the previous three years at rented facilities. (*Id.* at 26.)

Day described the scope of the activities ILC had previously conducted at other facilities. Day testified that between 2006 and 2009, most of ILC's meetings were conducted in private homes with fewer than forty attendees. (*Id.* at 28.) ILC also held meetings at Steeple Run Des Plaines Clubhouse with fifty to eighty attendees, at College of DuPage in "capacity rooms between 80 and 120," and at College of DuPage with 350 attendees for two larger events. (*Id.*) Day explained that the two larger meetings were multi-congregational events involving ILC and other groups, and that ILC did not intend to hold such meetings at the subject property. (*Id.*)

Day also described future uses contemplated by ILC. Day testified that ILC anticipated running a summer program for children. (*Id.* at 29.) Though he did not specifically provide the days of the week or hours during which this summer program would likely operate, Day explained that this summer program would include mentoring and tutoring for children when they are not in school and would accommodate eighty-five students plus staff. (*Id.* at 29-30.) Regarding the number of students, Day acknowledged that regardless of the success of the program, there would "be a physical limit to this facility set by the County." (*Id.* at 30.) Day also described additional activities which included religious mentoring of groups of less than ten participants, and religious family and marriage counseling for groups of less than six at a time. (*Id.*) Again, ILC's Application and Day's testimony do not specify the frequency or hours of these activities. Day also testified that ILC contemplated having a live-in caretaker and providing temporary housing for visiting scholars. (*Id.* at 37.)

Day informed the ZBA that the existing structures on the property would not be changed. (*Id.* at 20, 31.) Day testified, however, that ILC intended to add twenty parking spaces to the seven existing spaces, and sought approval for twelve additional banked spaces that would not be built "at the inception."[6] (*Id.* at 31.) The twenty additional parking spaces would require 3,950-square-feet of new paving on the property, (*id*) but Day assured the ZBA that ILC sought no variance from the DuPage County Stormwater Ordinance. (*Id.* at 34.) ILC also submitted a lighting plan that, according to Day, showed that if additional lighting were installed, ILC could comply with the standards for lighting at the property line as well as City of Naperville regulations concerning how much light leaves the property. (*Id.* at 34-35.) Day testified, however, that ILC did not intend to install additional lighting, and would do so only if the ZBA requested it. (*Id.* at 34.) During questioning by the Board members, Member Loftus stated that ILC would have to determine

---

[6]     The County Ordinance requires one parking space for every four worshipers.

whether or not it would have lights explaining, "[i]t's not for us to say you can do this. You make your case." (*Id.* at 47.) Day deferred to the Board, responding, "tell us what you want by way of code compliance and we'll do either one." (*Id.* at 48.)

At the close of his presentation, Day adopted the "written advocacy" included in the Application as part of his testimony in support of ILC's petition. (*Id.* at 37.) The Board Members then questioned Day about several issues. When asked if he anticipated anyone attempting to park on 75th Street, Day responded that ILC's goal was to ensure adequate parking on site, and that the twelve additional banked parking spaces were included in the plan in case the number of spaces required by the code became insufficient. (*Id.* at 39-40.) ZBA member Hakim asked if ILC's religious activities included "amplified call to worship" or "animal sacrifices?" (*Id.* at 40-41.) Day responded that they did not. (*Id.* at 41.) Members Hakim and Loftus also asked what ILC would do to prevent the neighbors from being disturbed by vehicle noise and lights, as well as the noise generated by people talking as they exited the building after services at 10:30 p.m. (*Id.* at 41, 43.) Day responded by stating that if the community had a noise abatement ordinance, ILC could not violate it. (*Id.* at 41.) He also stated that there was not "anything different about any Islamic church in relation to residential properties than there is to a Hindu temple, a Jewish synagogue or a Christian church" and, regardless of closing time, there had not been problems associated with churches in other communities. (*Id.* at 42.) Finally, Day stated that he believed the traffic on 75th Street generated more noise than anything that would come from the property. (*Id.* at 44.)

Noting that people like to "hang out in their back-yard" on Saturdays, Member Hakim also asked how outdoor play time during the Saturday religious school would affect the neighborhood. (*Id.*) Day responded that the three-acre site provided sufficient land to accommodate such activities, and that he did not believe that children playing outside a church during the day would pose a problem. (*Id.* at 45.) Day also reiterated that the activities included in the Application were the only uses ILC anticipated for the property. (*Id.* at 47.)

Several property owners from the area surrounding ILC's property (referred to by the parties collectively as the "Objectors") appeared at the ZBA public hearing on February 26, 2009. The Objectors testified and presented documents in opposition to the Plaintiff's petition.[7] (Pl.'s 56.1 Resp. ¶ 52.) Daniel Wallace, whose home is adjacent to ILC's property, spoke on behalf of the Objectors. (Feb. 26, 2009 ZBA Hr'g Tr. at 49.) Wallace began by explaining that the Objectors did not "begrudge the members of Irshad Learning Center the right to assemble and practice their faith according to the constitutional rights we enjoy." (Id. at 50-51.) He also stated that the Objectors viewed a "well-planned and properly-developed religious institution as at least potentially a very welcome addition to the neighborhood." (Id. at 51.) According to Wallace, the Objectors' concerns were "lack of planning, lack of proper development and the adequacy of the property for the intended use." He also voiced concerns about the adequacy and credibility of the information ILC presented to the board, as well as concerns about lighting, parking, drainage, adequacy of water or sewers, and fire protection. (Id. at 51-53.) The Objectors called for studies concerning the adequacy of water and septic service, fire safety, and traffic. (Id. at 53-54.)

The Objectors also believed that ILC's claim that it did not intend to grow was "ludicrous, because it is in the nature of religious institutions that they seek new members." (Id. at 55.) Even without growth, the Objectors were concerned that ILC's activities were too excessive for the property, and that ILC's intended use was substantially different and in excess of the prior Conditional Use of the Balkwill School. (Id. at 55-56.)

Further, Wallace reported that the Objectors believed that ILC's actual use would exceed the proposed use described in the Application. (Id. at 65.) The Objectors were reportedly concerned about the number of nights of activity and hours of operation, as well as the number of

---

[7] The Objectors submitted a petition, a "neighborhood letter," and other letters from individuals opposing ILC's Application. (Feb. 26, 2009 ZBA Hr'g Tr. at 50.) These documents are not in the record before this court.

cars and people that would occupy the property. (*Id.* at 60.) The Objectors were skeptical of ILC's assurance that its services would end by 10:30 p.m.; they reported that, according to the director of Steeple Run, ILC had asked for permission to use that facility until 2:00 a.m., and they presented an e-mail message[8] from ILC showing that some meetings went as late as 3:00 a.m. (*Id.* at 59-60.) Mr. Wallace also pointed out that the sun sets in the summer as late as 8:30 p.m., so if a service typically lasts three hours, it would not finish by 10:30 p.m.. (*Id.* at 58-59.)

Wallace pointed out that ILC's original (August 19, 2008) application for a learning center had called for thirty-nine parking spaces, generating suspicion on the part of the Objectors that ILC actually required thirty-nine spaces to meet its parking needs, but had reduced the number to avoid having to put in a driveway. (*Id.* at 60.) Further, Wallace testified that some of the Objectors went to an ILC meeting at Steeple Run in November 2008 at which they counted sixty-five cars in the lot, and the Islamic Federation Day School in January where they counted seventy-five cars. (*Id.* at 61.) He also testified that the director of Steeple Run informed them that ILC filled its lot, which contains sixty parking spaces, in excess of capacity, and when they visited the location, cars were parked on berms. (*Id.* at 61.)

The Objectors expressed the concern that the intensity of the use would constitute a nuisance. (*Id.* at 67-68.) Wallace testified that the director of Steeple Run told the Objectors that its facility has a capacity of 110, and the director believed that ILC exceeded that capacity on multiple occasions. (*Id.* at 63.) The Objectors also noted that ILC's IRS Form 990s state that ILC serves as many as 350-370 people. (*Id.* at 71.)

Eight other residents from the surrounding neighborhood went on record endorsing Wallace's statements and expressing additional concerns regarding noise from engines starting

---

[8]     September 19, 2008, e-mail from "IRSHAD LEARNING-Center" showing three events at Steeple Run ending at 3:00 a.m. (Sept. 19, 2008 Steeple Run e-mail [98-2], Ex. B to Pl.'s Opp'n, at 3.)

at night; headlights at night (*id.* at 72); a lack of trees, berms, fencing or other buffering to prevent light from disturbing the homes that border the property (*id.* at 74-75); and loss of existing trees and the buffer they provide. (*Id.* at 77.) Finally, one of the Objectors testified that the City of Naperville's Fire Prevention Supervisor had warned that the property's fire prevention system is inadequate. (*Id.* at 78.) Plaintiff's counsel requested time to review the objections and an opportunity to return and present testimony in response. (*Id.* at 80.) The hearing was continued to March 12, 2009. (*Id.* at 80-81.)

**ILC's Rebuttal**

On March 11, 2009, Day submitted a "Rebuttal Conditional Use Submittal." (*See* Rebuttal Conditional Use Submittal [86-9] (hereinafter "Rebuttal"), Ex. II to Pl.'s Mot., at 1-8.) The Rebuttal reiterated that ILC intended to use the property for religious uses including evening prayer services, religious education, weddings, funerals, and congregational gatherings. (*Id.* at 14.) In response to the Objectors' concerns regarding a lack of studies and drainage, sewer, and fire safety issues, the Rebuttal noted that the "DuPage County Board already made findings that 'all structures on the property comply with all applicable drainage, fire, and building codes, and that the subject property is inspected annually by the Naperville Fire Department and State Fire Marshal.'" (*Id.* at 9-10.) ILC also pointed out that the DuPage County Department of Transportation had no objections to the petition, and the County Stormwater Permitting Manager had recommended approval on behalf of the Stormwater Division of the Department of Economic Development. (*Id.* at 10.)

Regarding the intensity of ILC's proposed use, the Rebuttal noted that the Balkwill permit approved use of the building for a total of seventy people. (*Id.*) ILC reiterated that it had seventy-five members, its Application was for a maximum worshiper limit of 100, and such an occupancy limit was consistent with the applicable code. (*Id.* at 10, 14.) The Rebuttal also stated that the

number of proposed parking spaces exceeds the minimum required by the County code.[9] (*Id.* at 10-11.) ILC also compared its proposed use of the three-acre site to Our Saviour's Lutheran Church, which is located on a 3.6-acre plot and has 4,500 members, a worship capacity of 520, and 258 parking spaces. (*Id.* at 11.)

In response to the Objectors' assertion that ILC's meetings run as late as 3:00 a.m., ILC provided a letter from the office manager at Steeple Run which states that ILC rented that facility to conduct prayer services, and had requested a 3:00 a.m. close on just three of 123 lease dates. (Mar. 1, 2009 Steeple Run Letter [98-6], Ex. D to Pl.'s Opp'n to Def.'s Mot. [95] (hereinafter "Pl.'s Opp'n"), at 1.) The letter explained that on all other occasions, ILC rented the facility from sundown to 10:00 p.m., and that there have been no complaints regarding parking or noise. (*Id.*)

The exhibits to ILC's Rebuttal also include letters from Courtland Square Community Center of Des Plaines, the Islamic Foundation, and the College of DuPage. The Courtland Square letter confirms that ILC conducted fifteen Thursday evening prayer services at Courtland's clubhouse between 2007 and 2009. (Mar. 10, 2009 Courtland Square Letter [98-8], Ex. F to Pl.'s Opp'n, at 1.) These meetings, which ended no later than 10:30 p.m., normally had fifty attendees and never more than ninety. (*Id.*) The property manager stated that ILC always complied with rules and regulations regarding maintenance, parking, and noise. (*Id.*) The Islamic Foundation letter confirms that there are approximately fifty students enrolled in the Saturday School ILC conducts at that facility. (Mar. 10, 2009 Islamic Foundation Letter [98-7], Ex. E to Pl.'s Opp'n, at 1) The Islamic Foundation letter also states that ILC held a five-day holiday event in a lecture hall with an eighty-five person capacity, and a Persian New Year event in a 300-person capacity banquet hall. (*Id.*) These events ended at various times between 5:00 p.m. and 10:30 p.m., and no complaints

---

[9]     DuPage County Zoning Ordinance provides that a religious institution have one parking space for every four seats in the main worship area. (June 4, 2009 ZBA Flyer Sheet [86-11], Ex. KK to Pl.'s Mot., at 9.)

were ever filed regarding ILC's conduct. (*Id.*) The College of DuPage letters state that ILC had rented facilities for numerous events ranging in attendance from 50 to 300 people, and that ILC adhered to the rental requirements. (*See* College of DuPage Letters [86-10], Ex. JJ to Pl.'s Mot.)

**May 14, 2009 ZBA Hearing**

On March 12, 2009, ZBA continued the matter to May 14, 2009 to allow the Board members and Objectors an opportunity to review ILC's Rebuttal, which had been submitted the previous evening, and to give the Objectors time to submit written responses. (*See* Mar. 12, 2009 ZBA Hr'g Tr. [79-24], Ex. R to Def.'s 56.1 Stmt.) On May 14, 2009, representatives for the Objectors testified, reiterating their concerns about the frequency of ILC meetings, its hours of operation, and the number of people and cars that would be on the property. (*Id.* at 7.) The Objectors expressed particular concerns about what they believed to be uncertainty regarding the number of parking spaces required to meet ILC's needs. (*Id.*) They explained that they did not want the County to require ILC to put in more spaces; instead, they were opposed to turning the open green space bordering their properties into a parking lot. (*Id.* at 8.) The Objectors remained concerned that ILC had "significantly understated the intended intensity of the planned property use," making it impossible to determine whether ILC satisfied the relevant zoning criteria. (*Id.* at 5.) The Objectors requested that the County require ILC to "implement appropriate measures to eliminate negative effects and/or place restrictions on the conditional use permit." (*Id.* at 6.) The Objectors urged the County to deny the Application if ILC proved unwilling or unable to mitigate its impact on the surrounding properties. (*Id.*)

The Objectors submitted a written response to ILC's Rebuttal.[10] (May 14, 2009 ZBA Hr'g Tr. [79-23], Ex. Q to Def.'s 56.1 Stmt., at 3-4.) In addition, a neighbor who did not attend the

_____

[10]      Neither party provided the court with a copy of the Objectors' response; however, pages 8-18 of the response are excerpted in the June 4, 2009 Flyer Sheet. (June 4, 2009 ZBA Flyer Sheet at 10-19.)

hearing tendered a letter described as "a letter stating their experience at Steeple Run with the number of cars on three separate occasions."[11] (*Id.* at 10.)

ILC's zoning attorney urged the ZBA to rule on the application as submitted, not on the basis of the Objectors' assumption that ILC would later violate the law. (*Id.* at 13-14.) Day responded to the "lack of studies" objection by again pointing out that the County Planning Department had circulated ILC's Application to all the relevant departments and that no objections were raised. (*Id.* at 15-17.) Day also reiterated that ILC was asking for a permit that would allow 100 worshipers, twenty-seven to thirty-nine parking spaces, and a 10:30 p.m. closing time. (*Id.* at 19.) Day testified that ILC sought to conduct fifty-two regular Thursday worship services, as many as ten Ramadan services based on the church calendar, and twenty to twenty-five special events each year. (*Id.*) Day also testified that ILC was not using Steeple Run on at least one of the dates the Objectors claimed to have counted cars in the parking lot. (*Id.* at 21.) Day ended his testimony by offering to answer any questions. (*Id.* at 27.) Chairman Kartholl declined and closed the hearing. (*Id.*)

**June 4, 2009 ZBA Findings**

Prior to the June 4, 2009 ZBA meeting, County zoning staff, in consultation with ZBA staff, prepared a "Flyer Sheet."[12] The Flyer Sheet contains a description of the property, a summary of ILC's zoning request, the information submitted by the Objectors, and ZBA findings. (*See* June 4, 2009 ZBA Flyer Sheet [86-11], Ex. KK to Pl.'s Mot.) Section VII, "Irshad Learning Center Proposed Use of Property," outlines the time and frequency of the various services described in ILC's

---

[11]      This letter is not in the record and the parties have not described its content.

[12]      After the record closes on a zoning application, County zoning staff prepare a "flyer sheet" for the ZBA members' use at the recommendation hearing. The flyer sheet typically includes a description of the case, statements that were made, and relevant property information, but does not make a recommendation for or against the proposal. (Pl.s' 56.1 Stmt. ¶ 42.) The court notes that the June 4, 2009 flyer sheet does appear to make a recommendation against the application.

Application and its zoning attorney's testimony. (*Id.* at 6-8.) Section VII(A)(3), "meeting specifics," lists the meeting types and attendance figures from the various facilities at which ILC had previously rented space, consistent with ILC's zoning attorney's testimony. (*Id.* at 7-8.) Section VIII, "Site Plan," outlines ILC's proposed 100-person maximum occupancy of the main worship area, the number of parking spaces, and its photometric plan for exterior lighting. (*Id.* at 8-9.) There is no indication in the Flyer Sheet that any aspect of ILC's site plan failed to comply with the relevant codes and regulations. The Flyer Sheet states that ILC's use will not cause traffic congestion in the surrounding subdivisions, because these subdivisions do not have access to ILC's property. (*Id.* at 9.) The Flyer Sheet notes, further, that ILC intends to leave the existing landscaping in place and will include more landscaping if required by the County. (*Id.* at 10.)

The Flyer Sheet also reprints pages 8 to 18 of the Objectors' response to ILC's Rebuttal, in which the Objectors reiterated their concerns regarding a lack of studies of the impact and intensity of ILC's proposed use. (*Id.* at 11.) The Objectors remained concerned that the frequency of use, hours of use, number of people on the property, and number of cars on the property was too intense. (*Id.*) The Objectors presented information they believed showed that ILC's actual use would exceed its proposed use. (*Id.* at 12-18.) The Objectors noted concerns that ILC's use of the property would constitute a nuisance, increase the risk of flood damage, and diminish the value of the neighboring properties. (*Id.* at 12.) The Objectors also attacked ILC's credibility, claiming that ILC had intentionally presented the ZBA with incomplete and inaccurate information to support its Application. (*Id.* at 18-19.)

The ZBA concluded that ILC had not demonstrated that granting its Conditional Use was "in harmony with the general purpose and intent of the Zoning Ordinance, and will not be injurious to the neighborhood, detrimental to the public welfare, or in conflict with the County's comprehensive plan for development . . . ." (*Id.* at 21.) According to the ZBA,

[ILC's] testimony and correlating exhibits appear to contradict or at the very least do not sufficiently address parking and utility needs relative to the standards below associated with a use that exceeds 75 patrons as evidenced by petitioner's own testimony and testimony of objectors relative to the current operation of the Irshad Organization.

(*Id.* at 21.)  Specifically, the ZBA found that both ILC and the Objectors presented documents and testimony that contradicted ILC's assertions regarding "the number of patrons using the facility, time of use and intensity of use . . . ."  (*Id.* at 20.)  The ZBA also found that ILC's claim that it has only seventy-five members conflicted with the information presented by ILC and the Objectors.

(*Id.*)  Based on these findings, the ZBA concluded that

[ILC] has not thoroughly demonstrated that the proposed parking and circulation on the property and the septic and well conditions and considerations for the development as evidenced in [ILC's] correlating exhibits will be sufficient to accommodate the number of patrons that practically will be using the property based on [ILC's] testimony and the objectors[sic] testimony regarding current operations of [ILC] . . . .

(*Id.*)  In support of this conclusion, the ZBA noted that ILC and the Objectors had presented evidence that the existing operations of ILC "at various locations are varying in intensity of use, time of operation and number of services and events beyond those represented for 75 members."  (*Id.*)  The findings also stated that "no indication or documentation was provided as to how many patrons or facilitators would be involved" in several of the proposed uses including holiday events, religious services, summer programs, tutoring, and mentoring.  (*Id.* at 20-21.)

**June 4, 2009 ZBA Recommendation to Deny**

At the June 4, 2009 hearing, ZBA Member Loftus moved to deny the ILC request for the Conditional Use, stating that he did not believe that ILC had made its case.  (June 4, 2009 ZBA Hr'g Tr. at 4-5.)  Member Loftus did not believe that ILC had sufficiently rebutted the concerns raised by the Objectors.  (*Id.* at 5.)  He suggested that the evidence showed that ILC had more members than it had revealed, meaning that its proposed use of the property "required . . . a lot more work within the existing buildings and property than is allowable right now with the way it is."

(*Id*.)  Member Ketter seconded the motion, stating that he was "not sure" what evidence was put forth by the applicant and was uncomfortable because evidence had been presented by ILC's attorney, not members of its organization.  (*Id*. at 6.)  He described his additional basis for denying the motion as follows: "[a]nd with the concerns over whether they have – what specific amounts they are going to have for the conditional use, I am not sure that even their site planner – the changes that have to be made can be made."  While vague, as the court understands this comment, Member Ketter also believed that ILC would exceed the use described in the Application. Member Hakim concurred, citing discrepancies between the attendance numbers put forth in the petition and the evidence that was presented by ILC and the Objectors, which he believed "indicat[ed] in some cases as many as 350 attendees and not 70."  (*Id*. at 7.)  Member Hakim speculated that the property might not be able to handle the intensity of use.  (*Id*.)  Chairman Kartholl, citing that the Application was initially filed for a learning center and that the property has a swimming pool, stated that he did not believe that ILC had established that its "principal use is a religious institution."  (*Id*. at 7-8.)  Chairman Kartholl also expressed concerns regarding the intensity of the use and parking issues.  (*Id*. at 8.)  The ZBA voted unanimously to recommend denial of ILC's request.  (*Id*. at 8-9.)

**First Remand to the ZBA**

On July 2, 2007, ILC's zoning attorney sent a letter to the Chairwoman of the CDC concerning the ZBA's recommendation to deny ILC's Application.  (*See* July 2, 2009 Letter to CDC [86-15], Ex. OO to Pl.'s Mot.)  ILC's attorney accused the ZBA of, among other things, not making a determination based on the application before it.  (*Id*. at 1.)  He requested that the CDC return the matter to the ZBA, with instructions that the ZBA make a recommendation to the CDC based on the Application as filed, including:

- Islamic religious worship services restricted to no more than 100 worshipers;

- Islamic religious worship services restricted to ending no later than 10:30 p.m.;

- Islamic religious education classes restricted to no more than 85 students (not to be conducted concurrent with a worship service);

- 27 - 39 parking spaces;

- No variations; and

- Compliance with fire, safety, building and stormwater codes.

(*Id.* at 1-4.) The CDC met on July 7, 2009, and voted unanimously to remand the Application to the ZBA to "issue findings in accordance with the petition that has been filed by the petitioner and include adopted rationale and explanation for findings as they have been submitted." (Pl.'s 56.1 Stmt. ¶ 54.) On August 4, 2009, ILC's attorney sent another letter to both the ZBA and the CDC, noting that the CDC had remanded the matter to the ZBA for "deliberation and proper findings based upon the conditional use application . . . as filed," and urging that ILC had satisfied all seven criteria required for a conditional use by County Zoning Ordinance § 37-1413.5. (*See* Aug. 4, 2009 Letter to ZBA and CDC [86-18], Ex. RR to Pl.'s Mot.) County zoning staff issued a Flyer Sheet for the August 6, 2009 ZBA meeting which set forth specific instructions from the CDC. (Pl.'s 56.1 Stmt. ¶ 56.) At an August 6, 2009 ZBA meeting, Chairman Kartholl characterized the purpose of the CDC's remand as to allow the Board to "clarify its findings of fact in the matter." (*Id.* ¶ 55.)

**September 10, 2009 ZBA Findings**

The ZBA continued the matter to September 10, 2009, at which time the ZBA voted to adopt findings of fact and again recommended the denial of ILC's Application. (*Id.* ¶ 57.) In the findings it adopted, the ZBA explained that ILC did not tender any witnesses in support of its Application and did not present any testimony relative to its exhibits, and that Day's testimony was "made by way of argument and did not represent testimony on behalf of [ILC]." (*Id.* ¶¶ 57-58; Sept. 10, 2009 ZBA Memo to CDC [86-19], Ex. SS to Pl.'s Mot.) The new findings concluded that ILC had not

demonstrated that its proposed use was for a religious institution. The ZBA believed that "at the very least the religious aspect of the use appears to be subordinate to the general nature of the organization." (*Id.* at 3.) (The ZBA did not explain what it believed the general nature of the organization to be, if not religious.) Because, in the ZBA's view, ILC had not shown that its proposed use was for a religious institution, the ZBA found that ILC had not demonstrated that the proposed use was "in harmony with the general purpose and intent of the Zoning Ordinance, and will not be injurious to the neighborhood, detrimental to the public welfare, or in conflict with the County's comprehensive plan for development . . . ." (*Id.* at 3.) The new findings also stated that ILC did not demonstrate that "the subject property can sustain the current operations relative to parking, septic and well capacity, outside operation relative to noise and lighting, [and] internal building operation relative to occupancy capacity . . . ." (*Id.* at 3.) According to the ZBA, ILC had not shown that the property could support and sustain ILC's operations because the site plan and exhibits "do not appear to adequately support and at the very least are contradictory to the current operation of [ILC] at the various locations in DuPage County." (*Id.*) The ZBA also found that ILC had not clearly represented the nature and extent of the activities it sought to conduct on the property. Specifically, the ZBA found that ILC had not identified the days and hours of operation and the number of patrons that would attend its events. (*Id.* at 3-4.) Finally, the ZBA determined that ILC had not demonstrated that it met the seven standards for a Conditional Use outlined in Section 37-1413 of the Zoning Ordinance.

**ILC's Amended Application**

After the ZBA makes its recommendation, the application moves to the CDC for a recommendation to the County Board, which renders a final decision. (Zoning Procedures at 4.) The CDC may also opt to remand a petition to the ZBA "for reconsideration of its vote where significant new information has been made available." (*Id.* at 13.) On October 20, 2009 meeting,

the CDC considered the ZBA's recommendation to deny the ILC Application. (Oct. 20, 2009 CDC Meeting Minutes [86-20], Ex. TT to Pl.'s Mot., at 4.) Member Zediker moved to amend ILC's Application adding twelve conditions:

1. Restrict hours of use to 10:30 P.M. for all events/activities;

2. Allow one live-in caretaker;

3. Allow short-term occupancy by visiting scholar/clergy for not longer than two consecutive weeks (with family);

4. Exterior lighting not to exceed County standards at all lot lines;

5. No exterior sound amplification;

6. Landscaping depicted on Ex. 3 [to ILC application] to be maintained and full evergreen vegetation screening along west property line to be added;

7. Restrict occupancy to the lesser of 100 people or the number allowed based on building occupancy of principal structure;

8. Restrict worship services and other special events to principal structure and require education classes to be conducted within principal structure;

9. Restrict parking spaces to twenty-seven;

10. Compliance with all other County Codes and ordinances;

11. Make relief limited to operation of subject site by Irshad Learning Center; and

12. An amended site plan and landscape plan reflecting these shall be required to obtain any permit for the subject property.

(*Id.* at 4-5.) The members of the CDC present voted unanimously to approve the amended conditions. (*Id.*)

At some point after the October CDC meeting, CDC Chairman Michelassi and Board members Healy and Zediker held an informal meeting with Objectors to develop conditions which could be imposed that might satisfy the Objectors' concerns. (Pl.'s 56.1 Resp. ¶ 80.) Based on these discussions, Healy conveyed additional proposed conditions to ILC's attorney. (Pl.'s 56.1 Stmt. ¶ 63; Pl.'s 56.1 Resp. ¶ 80.) On November 5, 2009, CDC Chairman Michelassi convened

a second informal meeting, which included Zediker, members of the County staff, representatives of ILC, ILC's attorney, and Objectors. (Pl.'s 56.1 Stmt. ¶ 63; Pl.'s 56.1 Resp. ¶ 80; Michelassi Dep. [85-4], Ex. O to Pl.'s Mot., at 55:16-58:20.) The purpose of this meeting was to conduct an informal review of ILC's site plan, identify the remaining objections, and draw up a set of additional conditions to be presented at the following County Board meeting. (Michelassi Dep. at 55:16-58:20.) No record of what transpired at this meeting has been submitted, but it appears that it resulted in a proposal to impose the following requirements for approval of ILC's Application and revision to the site plan for the property:

- reconfiguring the parking lot to include thirty-nine parking spaces in front of the main structure;

- installation of minimum 30-inch berming around the west and east portion of the parking and circulation areas;

- planting of trees on top of the berming to be at least six feet tall;

- no occupancy or use of the building until all of the improvements are completed;

- limits on hours of operation for worship services and education services to between 6:00 a.m. and 10:30 p.m.; and

- commitment to extinguish all parking lot lighting by 10:45 p.m.

(Pl.'s 56.1 Stmt. ¶ 63.) ILC developed an alternative site plan in accordance with these changes, which was submitted to County zoning staff on November 9, 2009. (*Id.* ¶ 64.)

On November 10, 2009, the County Board considered ILC's Amended Application. (*Id.* ¶ 65.) During this meeting, Objectors again spoke in opposition to ILC's Application, raising issues which CDC Chairman Michelassi believed had been addressed and resolved at the November 5, 2009 informal meeting. (*Id.*) Chairman Michelassi moved to amend the Ordinance by adding the additional conditions, but no vote was taken. Instead, the County Board voted to remand the Application with the proposed amendments to the ZBA for yet another review. (*Id.* ¶ 66.)

On November 12, 2009, the U.S. Attorney's Office for the Southern District of New York

sought asset forfeiture against the Alavi Foundation, a New York-based not-for-profit "devoted to the promotion and support of Islamic culture and Persian language," because of its alleged association with the Iranian government.[13] The Alavi Foundation had provided partial financing to Plaintiff to assist its purchase of the property. (Pl.'s Compl. [1] ¶ 116.) On November 14, 2009, one of the neighbors to Plaintiff's property sent an e-mail to the County Board informing the members that the Alavi Foundation's assets had been seized and that ILC had received funds from the Alavi Foundation. (Pl.'s 56.1 Stmt. ¶ 69.)

At some point after learning of the connection between ILC and the Alavi Foundation, Member Zediker reportedly told the Naperville Sun that he wanted to make sure there were no Homeland Security regulations that could affect the ILC proposal (Zediker Dep. [85-9], Ex. T to Pl.'s Mot., at 64-65 ); when deposed, however, Zedike had no recollection of actually taking any action in that regard. (*Id.*) All the County Board members later testified that they believed the Alavi Foundation issue had no bearing on the ILC Application. (Pl.'s 56.1 Stmt. ¶ 69.)

Prior to the ZBA's December 7, 2009 hearing, County Board Chairman Schillerstrom directed CDC Chairman Michelassi to write a letter advising the ZBA of the second set of proposed conditions. (Pl.'s 56.1 Resp. ¶ 90.) For reasons unexplained in the record before the court, Michelassi failed to do so. (*Id.*) As a result, the more detailed conditions presented at the November 10, 2009 County Board meeting were not presented to the ZBA, and instead the ZBA was presented only with the twelve conditions previously recommended by the CDC on October 20, 2009. (Pl.'s 56.1 Stmt. ¶ 70; Pl.'s 56.1 Resp. ¶ 90.)

At the December 7, 2009 hearing, ZBA Chairman Kartholl observed that the ZBA had

---

[13] The record before the court does not spell out the details; however, according to an FBI press release, the U.S. Attorney alleged that Alavi's actions violated the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*, and executive orders barring certain financial transactions with the Iranian government. *See* "Manhattan U.S. Attorney Files Civil Action Seeking Forfeiture of Alavi Foundation's Interest in Fifth Avenue Office Tower Controlled by Iran," online at http://www.fbi.gov/newyork/press-releases/2009/nyfo111209a.htm (visited Mar. 7, 2013).

completed its deliberations on ILC's Application weeks earlier but had been asked to conduct a special public hearing to

> present to you, neighbors particularly, the conditions that were proposed for consideration by the County Board in order to determine whether you understand the conditions and whether, if those conditions were implemented as part of an approval process for this petition, whether the conditions would then alleviate the concerns of the public.

(Dec. 7, 2009 ZBA Hr'g Tr. [87-1], Ex. AAA to Pl.'s Mot.)  Neighbors again spoke out against the Application, raising issues regarding noise and light pollution, stormwater, and parking. (*Id.*) One of the neighbors expressed concern that the Alavi Foundation was the mortgage holder of the Plaintiff's property.[14] (Pl.'s 56.1 Stmt. ¶ 71.) Chairman Kartholl replied that the Board had "avoided considerations of those concerns because they are not . . . straight forward zoning issues." (Dec. 7, 2009 ZBA Hr'g Tr. at 17.) ILC's zoning attorney also spoke, reiterating ILC's willingness to comply with all applicable codes. (*Id.* at 30-34.) He stated that ILC would accept all the conditions except the maximum twenty-seven parking spaces; attorney Day noted that number is near the minimum required by the Code, not the maximum permitted. (*Id.* at 31-33.) Once again the ZBA voted unanimously to deny the ILC Application. (Pl.'s 56.1 Stmt. ¶ 72.) The ZBA also adopted the June 4, 2009 and September 10, 2009 findings as part of its December 7, 2009 recommendation and noted that the proposed conditions did not ameliorate the previous findings. (*Id.*)

**December 15, 2009 CDC Meeting**

As the ZBA had again recommended denial of the application, the CDC could either make a recommendation to the County Board, or again remand a petition to the ZBA. Zoning Procedures

---

[14]     The record does not reflect how this news reached the local community, but the court takes notice that the *Chicago Sun-Times* and *Chicago Tribune* ran articles in November 2009 discussing the reported tie between Irshad Learning Center and the Alavi Foundation. *See* Susan Frick Carlman, "Group Accused of Iran Ties Has Stake in Islamic Center: Foundation Holds Mortgage on Site of Planned Facility," *Chicago Sun-Times* (Nov. 15, 2009); Gerry Smith, "Islamic Center Foes Try New Tack: To Thwart Planned Move, Critics Cite Possible Iran Link," *Chicago Tribune* (Nov. 22, 2009).

at 4, 13. On December 15, 2009, the CDC held a meeting to consider the Application. The day before the meeting, a resident of Naperville e-mailed all of the County Board members urging the Board not to approve ILC's Application without "complete and absolute clearance from our local FBI and Homeland Security." (*Id.* ¶ 75.) At the December 15, 2009 CDC meeting, after hearing from both Objectors and petitioners, Member Michelassi moved to amend the original twelve conditions with the additional conditions presented on November 10, 2009. Member Enger seconded the motion, but the motion failed. (*Id.* ¶ 73.)

After the amended conditions failed, Member Michelassi moved to approve the ILC Application with the twelve CDC conditions presented on October 20, 2009. (*Id.* ¶ 74.) The motion passed by a vote of three to one. (Dec. 15, 2009 CDC Meeting Minutes [87-4], Ex. DDD to Pl.'s Mot., at 5.) Members Enger, Gonzalez, and Michelassi voted "Aye," while Member Olson voted "Nay." (*Id.*) Members Redick and Zediker abstained from voting because they felt the recommendation was the same as the one presented at the October 2009 meeting, and they had already voted on that matter. (*Id.*)

**County Board's Denial**

Having been approved by the CDC, the Application went on to the County Board for a final vote. (Zoning Procedures at 4.) The DuPage County Board scheduled a final vote on the Application for January 12, 2010. Prior to that meeting, on January 8, 2010, a representative of ACT! For America[15] e-mailed the County Board members alleging that ILC was lying to the Board and that ILC was in fact synonymous with the Alavi Foundation, had connections to terrorist organizations, and intended to use the property to spread radical-jihadist Islamic ideology. (Pl.'s

---

[15] Again, Plaintiff does not offer a description of Act! for America. The organization's website explains that it is a national group founded "because Islamic militants have declared war on America." *See* http://www.actforamerica.org. Act! for America reportedly has three local chapters in Illinois. http://www.actforamerica.org/index.php/local-chapters/find-a-local-chapter/12-states/90-illinois (visited Feb. 20, 2013).

56.1 Stmt. ¶ 76.)

Also on January 8, 2010, Board Member Jim Zay e-mailed an objecting neighbor stating: "I have been fighting this same battle in my district for years with these kinds of uses coming into residential neighborhoods. I have tried to change the zoning for religious institutions, social clubs, etc. but it was voted down by the board. You have a right when you buy your property to assume it will continue to be a residential area, not have these kinds of uses." (*Id.* ¶ 77.)

On January 12, 2010, the County Board held its last meeting on the ILC petition. A representative of ACT! For America spoke in opposition to ILC's Application, again asserting that ILC was in fact the Alavi Foundation and was "actively involved in deception." (*Id.* ¶ 78.) Board Members Bennington, Michelassi, and Zediker later testified that they believed these comments were "not appropriate" and "not pertinent to the conditional use." (*Id.*) Member Bennington found such comments to be "over the top." (*Id.*)

Prior to voting, some Board members commented on ILC's Ordinance. Member Zay expressed his opposition, referring to the dispute as one about "people's rights not religious rights," and observing that "this type of effort" does not belong in residential areas. (Jan. 12, 2010 CDC Meeting Minutes [87-6], Ex. FFF to Pl.'s Mot., at 1.) Member Puchalski stated that the petitioner had never testified at a hearing and the ZBA had voted the petition down three times. (*Id.*) Puchalski believed that the proposed use was too intense and the planned changes were insufficient. (*Id.*) Member Eckhoff noted that the petition restricts use after 10:30 p.m., but did not identify a specific starting time; he moved to amend the Ordinance to limit activities beginning earlier than 7:00 a.m. and restrict the number of vehicles parked on the property to twenty-seven. (*Id.*) This motion carried. Member Michelassi stated that he believed that overcrowding had been addressed with the passage of Eckhoff's amendment and that the Committee had done everything it could to protect the neighborhood. (*Id.*) Michelassi moved to approve the ILC Ordinance, and Member Healy seconded the motion. (*Id.*) The County Board voted 10-7 against the Application.

(Pl.'s 56.1 Stmt. ¶ 81.)

Members Enger and Gonzalez, who had previously voted for the Application in CDC meetings, now voted against it. (*Id.* ¶ 79.) Member Enger later testified that he visited ILC's property three times, once early in the ZBA hearings and twice during the CDC process. He acknowledges having voted in favor of the ILC petition with the twelve conditions at the CDC meeting on December 15, 2009, and could not recall why he voted against ILC's petition in January. (*Id.* ¶ 83.) Member Gonzalez testified that she intended to vote in favor of ILC's Application until she spoke with Member Enger just before the January 12, 2010 meeting. (*Id.* ¶ 82.) Gonzalez stated that Enger told her he had just visited ILC's property a day or two earlier and had noticed a large issue with the lighting affecting the neighbors. (*Id.*) County Board member Olson, like Enger, could not recall any specific reasons for their respective votes on the Application. (*Id.* ¶ 85.) Olson recalled only that she believed ILC's proposed use was "not appropriate" for the property. (*Id.*)

Ordinance Z08-074A (hereinafter "Irshad Ordinance") included the ZBA's findings from June 4, September 10, and December 7, 2008. The Ordinance does not include any additional or independent findings by the County Board or CDC. (See Irshad Ordinance [31-3], Ex. A to Defs.' Mot. To Dismiss; Pl.'s 56.1 Stmt. ¶ 88.)

**Plaintiff's Claims**

ILC brought an eleven-count complaint against the County of DuPage and individual members of the ZBA and County Board. All counts were dismissed against the individual Board members, and nine counts have survived against the County. (See Mar. 28, 2011 Mem. Op. and Order [46].) Count I alleges that the County violated the equal-terms and nondiscrimination provisions of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc(2)(b)(1)-(2). (Pl.'s Compl. ¶¶147-152.) Count II alleges that the County violated

the substantial burden provision of RLUIPA, 42 U.S.C. § 2000cc(2)(a). (*Id.* ¶¶ 153-59.) Count III, brought pursuant to 42 U.S.C. § 1983, alleges that the County and the individual Defendants violated the Plaintiff's right to the free exercise of religion in violation of the First and Fourteenth Amendments to the United States Constitution. (*Id.* ¶¶ 160-63.) Count V alleges that the County violated the Equal Protection Clause of the Fourteenth Amendment. (*Id.* ¶¶ 171-76.) Count VII seeks *de novo* legislative review of the County Board's decision. (*Id.* ¶¶ 188-190.) Count VIII seeks injunctive relief against the County to mandate compliance with its zoning standards and approval of the Application. (*Id.* ¶¶ 191-94.) Count IX alleges that the County violated the substantial burden prohibition in the Illinois Religious Freedom Restoration Act, 775 ILCS 35/15. (*Id.* ¶¶ 195-202.) Count X alleges that the County violated the Free Exercise Clause of the Illinois Constitution, Article I, Section 3. (*Id.* ¶¶ 203-05.) The parties have filed cross motions for summary judgment. Plaintiff seeks summary judgment on Counts II, III, VII, IX, and X. Defendant has moved for summary judgment on all of ILC's claims.

## DISCUSSION

### I.    Standard of Review

The court will grant summary judgment if, construing all facts in the light most favorable to the non-moving party, the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). If the moving party adduces sufficient evidence to show it is entitled to summary judgment, the non-moving party must "affirmatively demonstrate, by producing evidence that is more than merely colorable, that there is a genuine issue for trial." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011) (internal quotation marks and citation omitted). "By its very terms, this standard provides that the mere existence of some alleged factual disputes between the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-486 (1986) (emphasis in original).

Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

## II.     Counts I and V

### A.     RLUIPA Equal-Terms Provision

The County has moved for summary judgment on Count I, in which ILC alleges that the decision to deny its request for a Conditional Use Permit violates its rights under RLUIPA's equal-terms provision. That provision prohibits a government body from "impos[ing] or implement[ing] a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). To prevail on an equal-terms claim, ILC must show that "religious and secular land uses [have not been] . . . treated the same . . . from the standpoint of [an] accepted zoning criterion." *River of Life Kingdom Ministries v. Village of Hazel Crest*, 611 F.3d 367, 373 (7th Cir. 2010). The Seventh Circuit recognizes "three distinct kinds of Equal Terms statutory violations: (1) a statute that facially differentiates between religious and nonreligious assemblies or institutions; (2) a facially neutral statute that is nevertheless 'gerrymandered' to place a burden solely on religious, as opposed to nonreligious, assemblies or institutions; or (3) a truly neutral statute that is selectively enforced

31

against religious, as opposed to nonreligious assemblies or institutions." *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1003 (7th Cir. 2006) (quoting *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.*, 450 F.3d 1295, 1308 (11th Cir. 2006)).

ILC has not presented a facial challenge to the County Zoning Ordinance, nor does ILC allege that the Ordinance has been gerrymandered to burden religious institutions. ILC makes an "as-applied" equal-terms claim concerning the County's application of an otherwise neutral ordinance. *See Primera Iglesia*, 450 F.3d at 1310. Specifically, ILC alleges that the County engaged in disparate treatment of ILC's Conditional Use Application because the County had freely granted conditional use applications for non-religious institutional uses in similar circumstances. (Pl.'s Compl. ¶ 150.)

A plaintiff bringing an as-applied equal-terms challenge must present evidence that a nonreligious comparator received unequal treatment under the challenged regulation. *See Primera Iglesia*, 450 F.3d at 1311. For example, "[i]f a church and a community center, though different in many respects, do not differ with respect to any accepted zoning criterion, then an ordinance that allows one and forbids the other denies equality and violates the equal-terms provision." *River of Life*, 611 F.3d at 371. In another formulation, the Seventh Circuit explained that an equal-terms claim exists "whenever religious land uses are treated worse than comparable nonreligious ones." *Digrugilliers v. Consolidated City of Indianapolis*, 506 F.3d 612, 616 (7th Cir. 2007). If a plaintiff does not offer a suitable comparator, however, there can be no cognizable evidence of less than equal treatment, and the plaintiff cannot meet its initial burden of proof. *Primera Iglesia*, 450 F.3d at 1311 (citing 42 U.S.C. § 2000cc-2(b)).

## 1. Balkwill School

ILC alleges that the County's denial of its Application violates the unequal treatment provision in Section 2(b)(1) of RLUIPA because the same property was previously authorized for

a substantially similar use by the Balkwill School (Pl.'s Compl. ¶ 149), and ILC's Application received less favorable treatment than the Balkwill School's Application. (Id. ¶¶ 42-44, 149.) The County points out that the Balkwill Ordinance was never revoked, and thus, ILC is free to make use of the property in the same manner as the Balkwill School. (Def.'s Mem. at 15.) The court is not satisfied by the County's argument that, so long as ILC can use its property in precisely the same manner as the Balkwill School, there can be no equal-terms challenge. Certainly, if the County revoked a Conditional Use permit for a religious school that had been granted to a secular school, that would state an equal-terms claim. But RLUIPA does more than require that land use regulations contain "equal terms" for religious and non-religious uses; it requires that government "*treat[]* . . . religious assembl[ies] or institution[s] on . . . equal terms." 42 U.S.C. § 2000cc(b)(1) (emphasis added). Such equal treatment requires that a conditional use application from a religious institution, like Plaintiff, be given the same consideration and undergo the same review and approval process as would a Conditional Use application from a secular institution, like Balkwill.

ILC alleges that it did not receive the same consideration.[16] ILC claims that the ZBA subjected its Application to a "higher level of scrutiny" when analyzing the standard in the Zoning Ordinance (Pl.'s Mem. in Supp. of Mot. for Summ. J. [82] (hereinafter "Pl.'s Mem."), at 10), and that the zoning standards were applied inconsistently. (Id.) ILC reasons that since both secular schools such as the Balkwill School and religious institutions such as ILC require a Conditional Use, and the County had previously granted a conditional use for a secular school on the same property, the County should have granted ILC's Application. The ZBA should have found that ILC's petition met the same criteria as the Balkwill School, ILC urges, because ILC planned to make no alterations to the structures on the property, and because all of the departments which reviewed the Application expressed no objections and recommended approval. (Pl.'s Opp'n at 16.)

---

[16]     Plaintiff has not moved for summary judgment on Count I.

According to the County, ILC received different treatment than the Balkwill School because ILC's proposed use has "substantially different operational characteristics" from the Balkwill School with respect to accepted zoning criteria. (Def.'s Mem. at 13.) The County argues that the additional uses ILC seeks—such as weekend activities, extended hours, greater occupancy, and expanded parking—are not "substantially similar" to the Balkwill usage. (Id.) ILC responds that any differences in the proposed use of the property are not relevant because "the County's inclusion of religious institutions as a special use 'is tantamount to a legislative finding that the permitted use is in harmony with the general zoning plan and will not adversely the neighborhood.'" (Pl.'s Opp'n at 16) (quoting City of Chicago Heights v. Living Word Outreach Full Gospel Church & Ministries, Inc., 196 Ill.2d 1, 17, 749 N.E.2d 916, 927 (Ill. 2001)). ILC is correct regarding religious institutions in general: i.e., the County could not deny ILC's Application on the basis that as a religious institution, its proposed use is not in harmony with the Zoning Ordinance or the County's Development Plan. Living Word, 196 Ill.2d at 21-22, 749 N.E.2d at 929-30. This does not mean, as Plaintiff suggests, that any particular religious use, regardless of its nature or intensity, cannot be found to adversely affect the neighborhood. Indeed, a religious use, while in harmony with the Zoning Ordinance and the County's Development Plan, may still be denied if there are facts and circumstances that show that the particular use proposed at the particular location would have adverse effects above and beyond those inherently associated with such a special exception use, irrespective of its location within the zone. Id. RLUIPA equal-terms provision is violated when a religious use is not permitted, but a secular use is, only where the two uses do not differ with respect to any accepted zoning criterion. River of Life, 611 F.3d at 371.

With this in mind, the court considers whether the Balkwill School is an adequate comparator. The Balkwill School began operating on the property in 1994 and was granted a Conditional Use by the County in 2006. (Pl.'s 56.1 Stmt. ¶¶ 9, 17.) ILC's Application did not seek to change the existing structures on the property. (Feb. 26, 2009 ZBA Hr'g Tr. at 20, 31.) The only

proposed alteration on the property was the addition of twenty parking spaces to the seven existing spaces, as well as twelve additional banked spaces, adding 3,950-square-feet of paved surface on the property. (*Id.* at 31.) According to ILC, the ZBA should have found that all of the zoning standards for its proposed conditional use were met because the Balkwill School was previously granted a Conditional Use for the same property, all structures were the same, and no pertinent government department asserted any objection to the application. (Pl.'s Mem. at 10.)

Although ILC did not propose to change any of the structures on the property, the nature and intensity of ILC's proposed use is substantially different than the use approved under the Balkwill Ordinance. (*See* Balkwill Ordinance.) The Balkwill Ordinance permitted the use of the subject property for a private school, which allowed for enrollment of sixty-five children, at least five additional adults (including two staff to participate in daily school activities), and three residents. (Pl.'s 56.1 Stmt. ¶ 16.) ILC sought approval to accommodate as many as 100 worshipers, increasing the number of the occupants by over forty percent. Further, the Balkwill School only had seven paved parking spaces located in front of the main structure. (Pl.'s 56.1 Resp. ¶ 28.) ILC sought to add twenty to thirty-two parking spaces to accommodate the number of people who may be on site at any time.

The Balkwill Ordinance limited the Balkwill School's hours from 7:30 a.m. to 12:30 p.m., Monday to Friday, with no weekend activities. (*Id.*) ILC's Application seeks to operate beyond the hours previously approved for the Balkwill School. The Application specified religious services on Thursday evenings to begin at sunset, but no earlier than 6:30 p.m., and to end three hours later, as well as religious education classes for its fifty-five students on Saturdays from 11:00 a.m. to 4:00 p.m. (*See* Zoning Application; Pl.'s 56.1 Resp. ¶ 32.) Additional conditions added to the ILC Amended Application permitted hours of operation from 6:00 a.m. to 10:30 p.m., and permitted exterior lighting to remain illuminated until 10:45 p.m. (Pl.'s 56.1 Stmt. ¶ 63.)

ILC also sought to use the property to hold holiday events and "special events," such as weddings, funerals, and congregational meetings. (Feb. 26, 2009 ZBA Hr'g Tr. at 26-27.) ILC further contemplated a summer program for eighty-five students plus staff (*Id.* at 29-30), and additional activities including religious mentoring and religious family and marriage counseling. (*Id.*) ILC did not specify when, or how frequently, many of these additional activities would take place, but presumably, many would have to occur on days and times beyond the hours specified for the Thursday services and Saturday classes proposed in the Application. (*Id.* at 29.)

The ZBA and the Objectors raised concerns that included additional traffic and disturbances resulting from the larger numbers of people and vehicles that would occupy the property. The ZBA found that ILC's use would not cause traffic congestion in the surrounding subdivisions because those subdivisions do not have access to the ILC property (June 4, 2009 ZBA Flyer Sheet at 9); however, noise and light generated by larger numbers of people and vehicles on the property at later hours remained issues. ILC's proposed use significantly exceeds the occupancy levels and parking requirements of the Balkwill use. ILC's proposed use also exceeds that of the Balkwill School in duration and intensity. Although ILC did not specify how many days it would operate each week, its proposed conditions sought longer hours as well as Saturday operations. Further, ILC's principal uses would occur in the evening and on the weekend when the Balkwill School had been closed.

The County contends that ILC's proposed use would have a greater impact on the surrounding neighborhood than the use approved for the Balkwill School, and the court concludes that there are no disputes of fact on this issue. The additional impact could conceivably affect public health, safety, comfort, or the general welfare of the neighboring residents or otherwise create a nuisance. *See* County Zoning Ordinance 37-1314.A.7 Given the differences in use, the County was not bound to make the same findings for ILC that it made for the Balkwill Ordinance. Whether those differences actually justified denial of ILC's petition is another question.

Nonetheless, the Balkwill School had substantially different operational characteristics with regard to relevant zoning criteria, which compels the conclusion that there is no evidence to support a claim of unequal treatment under RLUIPA. *See Vision Church*, 468 F.3d at 1003. Given the differences in proposed use, Plaintiff has not established that the Balkwill School would have been treated any differently had it sought a Conditional Use for the use proposed by ILC.

### 2. New Day Montessori Day Care

Plaintiff also argues that it was treated less favorably than the New Day Montessori Day Care ("New Day"), which operates on the other side of 75th Street. (Pl.'s Opp'n at 17.) ILC points out that during the ZBA hearing for New Day's Conditional Use, an attorney presented testimony on behalf of New Day, and Chairman Kartholl interrupted the zoning attorney's presentation to question the day care operator before she had offered any testimony. (Pl.'s Opp'n at 17; May 15, 2000 New Day Hr'g Tr. [98-17], Ex. O to Pl.'s Opp'n, at 12-65.) ILC argues that this is an example of more favorable treatment, because the ZBA did not direct any questions to the ILC representatives at the February 26, 2009 hearing on its Application and later faulted ILC for not offering any witnesses in support of its Application. Chairman Kartholl later explained that he did not want to interrupt ILC's attorney's presentation to question the ILC representative, and the County now claims that the ZBA members could not have questioned the ILC representatives at any point during the hearing because the ZBA cannot question witnesses who have not first offered testimony on the record.

During the New Day ZBA hearing, Chairman Kartholl also addressed objectors' questions by stating that he would answer them or direct them to the petitioner's attorney. (Pl.'s Opp'n at 17; May 15, 2000 New Day Hr'g Tr. at 67.) ILC suggests that this is another example of more favorable treatment; during the hearing on ILC's application the ZBA did not offer to answer the Objectors' questions, and the County now claims that ILC denied the Objectors' their due process

rights because the Objectors were not permitted to cross examine the ILC representatives. Further, New Day's petition was approved by the ZBA in less than two months. (Pl.'s Opp'n at 17.)

ILC has shown only that New Day was in some respects treated differently than ILC. While, as discussed below, these differences cast doubt upon some justifications the County has offered in defense of its denial of ILC's Application, ILC has not advanced any argument or made any attempt to demonstrate that New Day's property and/or proposed use were similar to ILC's with respect to any accepted zoning criterion. Recognizing that the equal-terms provision does not require that ILC demonstrate an exact comparison, it must still establish that it was sufficiently similar to New Day with respect to accepted zoning criteria in order to prevail on an equal-terms claim. *See River of Life*, 611 F.3d at 371. Plaintiff has not done so. Defendant's motion for summary judgment is granted as to Plaintiff's equal-terms claim in Count I.

### B. RLUIPA Nondiscrimination and Equal Protection

ILC's claim under RLUIPA's non-discrimination provision in Count I and its Equal Protection Clause claim in Count IV are based on the same theories and rely on the same facts, and will thus be discussed together. (Pl.'s Opp'n at 15, 18.) ILC's RLUIPA non-discrimination provision and Equal Protection Clause claims allege that the County treated it differently than similarly situated secular, as well as non-Muslim religious, institutions. (*Id.*) Alternatively, ILC argues that the County unequally applied its Zoning Ordinance for the purpose of discriminating against ILC. (*Id.*) Defendant moves for summary judgment on both claims, while Plaintiff contends that disputed issues of material fact preclude summary judgment.

#### 1. Equal Protection

The Equal Protection Clause prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. Am. XIV, § 1. The Amendment "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v.*

*Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Under RLUIPA's non-discrimination provision, "[n]o government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2). RLUIPA's requirement that similarly situated religious and non-religious assemblies or institutions receive equal treatment does not expand on the religion clauses of the Equal Protection Clause, but rather, reiterates the requirements of the First Amendment and the Equal Protection Clause, as they apply to religion. To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination. If a government infringes upon a fundamental right, "the government's justification for the regulation must satisfy the strict scrutiny test to pass muster under the Equal Protection Clause." *Srail v. Vill. of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009).

Plaintiff alleges that the County treated ILC differently from non-Muslim religious institutions. For example, the ZBA's denial rested in part on its finding that Plaintiff had not "clearly demonstrated that the granting of the Conditional Use . . . will not be injurious to the neighborhood [or] detrimental to the public welfare." (Irshad Zoning Ordinance at 6.) Plaintiff points out that "[e]very church, including the twenty-three (23) in unincorporated DuPage County, is adjacent to residential land uses . . . ." (Pl.'s Compl. ¶ 85.) Plaintiff also notes that there are five other religious institutions within a one-half mile radius of the property. (*Id.* ¶ 50.)

The mere existence of other religious uses in the general area is insufficient to support an Equal Protection claim. The Seventh Circuit has held that similarly situated comparators must be *prima facie* identical or directly comparable to plaintiff in all relevant respects. *Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 680 (7th Cir. 2005) (citations omitted); see also *Campbell v. Rainbow City*, 434 F.3d 1306, 1315 (11th Cir. 2006) (In order for any religious assembly or institution to be similarly situated to Plaintiff, it must be prima facie identical in all

39

relevant respects.); *Church of Scientology of Ga., Inc. v. City of Sandy Springs*, 843 F. Supp. 2d 1328, 1362 (N.D. Ga. 2012) ("In the zoning context a showing that two projects were similarly situated requires some specificity.")

In response to the County's motion for summary judgment, ILC argues that it was treated less favorably than the Naperville Korean First Presbyterian Church. (Pl.'s Resp. at 18-20.) In 2005, Naperville Korean First Presbyterian Church purchased a 4.2-acre property, which was zoned R-1 and occupied by an existing church building that had been unitized by other congregations at that location since the 1960s. (Naperville Korean First Presbyterian Church Ordinance [98-14] (hereinafter "Naperville Korean Ordinance"), Ex. L to Pl.'s Opp'n, at 1.) In 2007, the Church sought approval to expand its facilities, adding a gymnasium, offices, and expanding the parking lot from 180 spaces to 201 spaces. (Apr. 19, 2007 Naperville Korean ZBA Hr'g Tr. [98-15], Ex. M to Pl.'s Opp'n, at 5-6.) At the first of two hearings on its Conditional Use Permit, the Church's zoning attorney testified on behalf of the Church. Chairman Kartholl recognized the attorney's right to testify as "an officer of the court." (*Id.* at 7.) A Church representative who was present at the hearing testified only after Chairman Kartholl began asking him specific questions regarding the Church's operations. (*Id.* at 13.)

ILC points out that Chairman Kartholl and other ZBA members addressed objections to Naperville Korean First Presbyterian's use that were similar to some of those raised concerning ILC's petition. At the hearing, several objecting neighbors spoke out against the proposed expansion. (*Id.* at 18-41.) In response to objections regarding stormwater, Chairman Kartholl explained that the Stormwater Division had no concerns, and this division had "qualified people" making these decisions. (*Id.* at 36:2-38:11.) When questions were raised regarding the church's potential expansion of membership, the ZBA explicitly acknowledged: "We can't guess or try to put something in the future. We just have to address what is presented." (*Id.* at 45:15-46:12.) In response to concerns related to the parking lot expansion, Member Hoss explained that the

required number of parking spaces was determined based on the occupancy level in the main worship area, not the actual congregation size. (*Id.* at 41:2-42:4.) Chairman Kartholl agreed, stating that the church could have multiple services to accommodate 1000 people even though the main worship area only accommodated 450 people. (*Id.*)

ILC has not shown that either Naperville Korean First Presbyterian or its expansion were directly comparable to ILC and its proposed use. Naperville Korean First Presbyterian is a substantially larger congregation, using a much larger facility. (*Id.* at 41:2-42:4.) More importantly, the uses sought by ILC and Naperville Korean First Presbyterian were quite different, and had different implications for the surrounding properties. Naperville Korean First Presbyterian was not seeking to put its property to a new use. The site had been home to a church since the 1960s, and Naperville Korean First Presbyterian had been active at that location for approximately two years before it sought the expansion. (Naperville Korean Ordinance at 1.) Further, the Naperville Korean First Presbyterian proposal appears to be an effort to address concerns from neighbors about noise, parking problems, and traffic generated by Naperville Korean First Presbyterian's current use of the property. (Apr. 19, 2007 Naperville Korean ZBA Hr'g Tr. at 21:22-62:8.) The construction of the gymnasium and expanded parking were sought, in part, to alleviate these existing problems by moving outside activities into the gymnasium, and providing more parking spaces on the property for vehicles currently parking on the neighborhood streets. (*Id.* at 50:21-54:15.) Naperville Korean First Presbyterian, and the Conditional Use permitted by the Naperville Korean Ordinance that ILC has brought to the court's attention, are not identical or directly comparable to ILC in all relevant respects. *Racine Charter One*, 424 F.3d at 680. Here again, ILC has shown that a potential comparator was treated differently in some respects, and the differences in treatment cast doubt upon some justifications the County has offered in defense of its treatment of ILC's Application. ILC cannot, however, show that its proposed comparator is sufficiently similarly situated to support an Equal Protection claim. Defendant's motion for summary judgment

is granted as to Count IV.

### 2. Non-discrimination

The court turns next to ILC's claim that the County unequally applied its Zoning Ordinance for the purpose of discriminating against ILC. ILC need not offer a comparator to sustain its RLUIPA non-discrimination claim. ILC need only demonstrate that the County denied its Conditional Use "on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2). The County maintains that there is no evidence of religious, racial, or national origin bias or prejudice by the County. (Def.'s Mem. at 3, 19.)

The County asserts that there is no evidence that the County discriminated against ILC, or that the County's decision was motivated by ILC's religious affiliation. (Def.'s Mem. at 20.) The court agrees. ILC filed its Application in December 2008. Between December 2008 and November 2009, when the news regarding the Alavi Foundation broke, there is no evidence that the County was in any way influenced by ILC's religious character. ILC notes that during the February 26, 2009 hearing, ZBA member Hakim asked whether ILC's activities included "amplified call to worship" or "animal sacrifices." (Feb. 26, 2009 ZBA Hr'g Tr. at 40-41.) While ILC's representatives understandably found the question regarding animal sacrifices offensive, the question reflects ignorance regarding ILC's religious practices, and not discriminatory intent. ILC's attorney answered Hakim's questions, presumably dispelling his ignorance regarding these practices, and concerns regarding animal sacrifices or the call to worship were never raised again.

It was not until nearly nine months later that ILC's connection with the Alavi Foundation was brought to the County Board's attention. When the ZBA conducted the first public hearing following the Alavi Foundation news, the ZBA Chairman stated that the Board had "avoided considerations of those concerns because they are not . . . straight forward zoning issues." (Dec. 7, 2009 ZBA Hr'g Tr. at 17.) At that hearing, the ZBA voted to deny ILC's Application. This was nothing new,

however, as the ZBA had twice voted to deny Plaintiff's petition before the Alavi indictments occurred and before the public comments regarding ILC's religious character arose.

This changed, arguably, in January 2010, when groups such as the Naperville Tea Patriots and ACT! For America began urging the County to deny ILC's Application for reasons that suggest religious, racial, or national origin bias and prejudice. At the January 12 County Board meeting, issues related to ILC's religious character—rather than issues regarding zoning criteria—began to take center stage. This shift, however, was caused by members of the community speaking out in opposition to ILC's Application. ILC asserts that under RLUIPA and Section 1983, courts have found discriminatory statements by board members to be circumstantial evidence of discriminatory intent that, when combined with other evidence, may be sufficient to establish municipal liability. (*See* Pl.'s Opp'n at 6) (citing *Church of Scientology of Ga., Inc. v. City of Sandy Springs*, 843 F. Supp 2d at 1375-76 & n.43 (N.D. Ga. 2012); *Reaching Hearts Int'l, Inc. v. Prince George's County*, 584 F. Supp. 2d 766, 782-83 (D. Md. 2008); *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977)). In this case, however, the discriminatory statements, while often directed at County officials, were made by members of the public. There is no evidence of discriminatory statements by the Board members or any other County officials or employees, and no other basis for the conclusion that pressure from prejudiced community members influenced the vote.

Prior to voting, two board members spoke out against the ordinance, but their comments did not reflect discriminatory intent. Member Puchalski spoke out against the Ordinance, but his comments pertained to the intensity of the proposed use and the inadequacy of the conditions. (Jan. 12, 2010 CDC Meeting Minutes.) Member Zay also spoke out against the Ordinance, stating that he believed the issues were "people's rights not religious rights," and that "this type of use" does not belong in residential areas. (*Id.*) There is also evidence that Member Zay e-mailed an objecting neighbor a few days prior to the hearing on January 8, 2010, expressing opposition to any assembly, religious or secular, in residential areas. Member Zay wrote: "I have been fighting this

same battle in my district for years with these kinds of uses coming into residential neighborhoods. I have tried to change the zoning for religious institutions, social clubs, etc. but it was voted down by the board. You have a right when you buy your property to assume it will continue to be a residential area, not have these kinds of uses." (Pl.'s 56.1 Stmt. ¶ 77.) Member Zay's comments are troublesome because his personal feelings regarding assemblies such as ILC in residential areas appear to be in conflict with the County Zoning Ordinance, which authorizes such a use when the proposed use meets the applicable zoning criteria. That said, Zay's comments did not single out ILC's religious character and do not appear on their face to reflect discriminatory intent.

As described earlier, Members Enger and Gonzalez, who had previously voted for ILC's Application in CDC meetings, voted against it at the January 12 meeting. (*Id.* ¶ 79.) Member Enger later testified that he visited ILC's property three times, once early in the ZBA hearings and twice during the CDC process, and had still voted in favor of the ILC petition with the twelve conditions at the CDC meeting on December 15, 2009. (*Id.* ¶ 83.) Though Enger could not recall why he later voted against ILC's petition, Member Gonzalez's testimony suggests that Member Enger may have been motivated by his observation of lighting issues affecting the neighbors. (*Id.* ¶¶ 82-83.) County Board members Olson and Enger could not recall any specific reasons for their respective votes on the Application. (*Id.* ¶ 85.) Olson only recalled that she believed ILC's proposed use was "not appropriate" for the property. (*Id.*)

This evidence is not sufficient to support an inference that the County denied ILC's Conditional Use "on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2). Defendant's motion for summary judgment is granted as to Plaintiff's RLUIPA non-discrimination claim in Count I.

## III.   Counts II and IX

Both Plaintiff and Defendant seek summary judgment on Plaintiff's claims that a substantial

burden has been imposed in violation of RLUIPA and the Illinois Religious Freedom Restoration Act, 775 ILCS 35/15.

## A.    RLUIPA Substantial Burden

Under RLUIPA's substantial burden provision, "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution," unless the government can show that it has done so to further a compelling governmental interest and that it has utilized the least restrictive means of doing so. 42 U.S.C. § 2000cc(a)(1). "In order to prevail on a claim under the substantial burden provision, a plaintiff must first demonstrate that the regulation at issue actually imposes a substantial burden on religious exercise." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760 (7th Cir. 2003). RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," including "[t]he use, building, or conversion of real property for the purpose of religious exercise." *Id.* (citing 42 U.S.C. § 2000cc-5(7)).

"Substantial burden" has been interpreted by reference to the Religious Freedom Restoration Act ("RFRA") and First Amendment jurisprudence. *Id.* "Substantial burden" does not mean "greater burden than imposed on secular institutions," as that is what is forbidden by RLUIPA's equal-terms provision. *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 900 (7th Cir. 2005); 42 U.S.C. § 2000cc(b)(1); see also *id.*, 2000cc(b)(2). The Seventh Circuit has determined that a government action imposes a substantial burden on religious exercise if it "'necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise–including the use of real property for the purpose thereof within the regulated jurisdiction generally–effectively impracticable.'" *Vision Church*, 468 F.3d at 997 (quoting *Civil Liberties for Urban Believers*, 342 F.3d at 761).

The County points out that ILC had the opportunity to purchase other properties in DuPage, and at one point owned a property on which it could have built a facility. (Def.'s Resp. to Pl.'s Mem. [93] (hereinafter "Def.'s Resp."), at 5.) Between 2003 and 2008, ILC made offers to purchase four other properties, including a church in Schaumburg and another church in unincorporated DuPage County. (Pl.'s 56.1 Stmt. ¶ 7; Pl.'s 56.1 Resp. ¶¶ 12, 16.) At some point, ILC purchased property in Lisle, DuPage County, Illinois, on which it initially intended to construct a new building, but later decided to sell that property because it lacked the funds to build a new structure on that property. (Pl.'s 56.1 Stmt. ¶ 7; Pl.'s 56.1 Resp. ¶ 15.) Based in part on these facts, the County argues first that ILC has not presented evidence of a problem locating property for a religious institution in unincorporated DuPage County. (Def.'s Mem. at 17.)

This argument overstates the test, however. ILC can establish a substantial burden without showing "that there was no other parcel of land on which it could build its church." *Sts. Constantine and Helen*, 396 F.3d at 899. In *Sts. Constantine and Helen*, the court concluded that the city had placed a "substantial burden" on the church in denying its zoning application even though "[t]he Church could have searched around for other parcels of land . . . , or it could have continued filing applications with the City, but in either case there would have been delay, uncertainty, and expense. That the burden would not be insuperable would not make it insubstantial." *Id.* at 901.[17]

The County argues further that ILC's presentation to the ZBA was fundamentally flawed and that ILC failed to establish the nature and intensity of its proposed use. (Def.'s Mem. at 6, 9-12;

---

[17]     Though RLUIPA's "substantial burden" provision could be read to favor religious uses over secular uses, in violation of the Establishment Clause, the Supreme Court has held it does not. *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005). The court explained, in evaluating a challenge to the "substantial burden" provision as applied to prisoners, that "there is room for play in the joints between the Free Exercise and the Establishment Clauses, allowing the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause," but acknowledging that "accommodation must be measured so that it does not override other significant interests." *Id.* at 713-14, 722 (citation and quotation omitted). Defendants have not argued that applying the "substantial burden" provision as Plaintiff urges here would be unconstitutional.

Def.'s Resp. at 3.) The County was entitled to consider that failure as it would for any application when making its decision, Defendant argues. "[G]enerally applicable burdens, neutrally imposed, are not 'substantial.'" *Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338, 350 (2nd Cir. 2007) (citing *Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378, 389-91 (1990). Land use conditions do not constitute a substantial burden under RLUIPA where they are "neutral and traceable to municipal land planning goals" and where there is no evidence that government actions were taken "*because* [plaintiff] is a *religious* institution." *Vision Church*, 468 F.3d at 998-99; see also *Living Water Church of God v. Charter Tp. of Meridian*, 258 Fed.Appx. 729, 736 (6th Cir. 2007) ("If the term 'substantial burden' is not to be read out of the statute, RLUIPA cannot stand for the proposition that a construction plan is immune from a town's zoning ordinance simply because the institution undertaking the construction pursues a religious mission.") (citation omitted); *San Jose Christian Coll., v. City of Morgan Hill*, 360 F.3d 1024, 1035 (9th Cir. 2004) (no substantial burden was imposed, even where an ordinance "rendered [plaintiff] unable to provide education and/or worship" on its property, because the plaintiff was not "precluded from using other sites within the city" and because "there [is no] evidence that the City would not impose the same requirements on any other entity."); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227-28 & n. 11 (11th Cir. 2004) (The Eleventh Circuit has also ruled that "reasonable 'run of the mill' zoning considerations do not constitute substantial burdens.")

Conversely, the arbitrary application of a zoning ordinance to religious organizations "may reflect bias or discrimination against religion." *Westchester Day Sch.*, 504 F.3d at 350. "The same reasoning that precludes a religious organization from demonstrating substantial burden in the neutral application of legitimate land use restrictions may, in fact, support a substantial burden claim where land use restrictions are imposed on the religious institution arbitrarily, capriciously, or unlawfully." *Id*. For example, in *Sts. Constantine and Helen*, the Seventh Circuit concluded that a substantial burden was demonstrated in circumstances where the "decision maker cannot justify"

the challenged ruling and where "repeated legal errors by the City's officials casts doubt on their good faith." 396 F.3d at 899-901. Similarly, in *Guru Nanak Sikh Soc'y v. County of Sutter*, the Ninth Circuit held that a substantial burden was shown where government officials "inconsistently applied" specific policies and disregarded relevant findings "without explanation." 456 F.3d 978, 989-91 (9th Cir. 2006). Where the arbitrary, capricious, or unlawful nature of a defendant's actions suggest that a religious institution received less than even-handed treatment, the application of RLUIPA's substantial burden provision usefully "backstops the explicit prohibition of religious discrimination in the later section of the Act." *Sts. Constantine and Helen*, 396 F.3d at 900.

Here, ILC argues that the County refused to grant its Conditional Use "in an arbitrary and capricious manner, contrary to the dictates in the Zoning Ordinance and regardless of the conditions proposed by ILC or to which it agreed." (Pl.'s Mem. at 6-7.) The County contends that the denial was the result of ILC's failure to meet its burden to establish that it satisfied each of the applicable zoning criteria. (Def.'s Resp. at 3.) According to the County, ILC's Application was denied as a result of shortcomings in ILC's presentation to the ZBA (Def.'s Mem. at 13-14), and its failure to establish the precise nature and intensity of its proposed use. (Def.'s Mem. at 12; Def.'s Resp. at 3.) The court considers these arguments below.

### 1. ILC's ZBA presentation

First, the County asserts that ILC's Application was denied because of flaws in its presentation to the ZBA. (Def.'s Mem. at 6-12.) The County claims that ILC failed to present competent evidence at the ZBA hearings. (Def.'s Mem. at 7.) ILC's zoning attorney Scott Day was the only person who testified on ILC's behalf at any of the ZBA hearings, and the County claims that Day's testimony was "made by way of argument and did not represent testimony on behalf of [ILC]." (Pl.'s 56.1 Stmt. ¶ 58.) The County suggests that a petitioner cannot offer testimony through an attorney alone, and that in doing so, ILC "stripp[ed] interested parties of their due

process rights, including the right to conduct meaningful cross-examinations." (Def.'s Resp. at 11.)

The County's argument that ILC was not permitted to rely on the testimony of its attorney appears to be inconsistent with its own regulations. The County's Zoning Procedures provide that "Petitioner or agent must attend the Public Hearing . . . [and] Petitioner should be prepared to answer questions from the Zoning Board, staff, and members of the public." Zoning Procedures at 4 (emphasis added). The February 26, 2009 ZBA hearing was attended by ILC's zoning attorney, Scott Day, and by several representatives of ILC. (Feb, 26, 2009 ZBA Hr'g Tr. at 5-6; Pl.'s 56.1 Stmt. ¶ 34.) Day informed the ZBA that the representatives were present to answer the Board's questions, and the representatives were in fact sworn in. (*Id.* at 9.)

ZBA Rule of Procedure 4.1(c) provides further that "[t]he Board will first hear statements from the petitioner or his attorney and/or witnesses." (emphasis added). Upon completion of the petitioner's presentation, ZBA members and staff are permitted to ask questions. (ZBA Rule of Procedure 4.1(d).) At the February 26 hearing, ILC offered testimony into the record through its zoning attorney, and the zoning attorney responded to questions from Board members both during and after his presentation. The Board members did not direct any questions to the ILC representatives who were present and under oath.

After the Board's questions are answered, the Chairman asks for questions from the public. (ZBA Rule of Procedure 4.1(e).) It is only after the public has an opportunity to ask questions of the petitioner that the Board hears additional statements or testimony from others in support of, or opposition to, the petition. (ZBA Rules of Procedure 4.1(f), (g), (h).) At the February 26 hearing, Chairman Kartholl permitted members of the public to make statements in opposition to the petition, without first permitting the public the opportunity to question Day or the ILC representatives. To the extent that the members of the public raised questions during their statements regarding the petition, these questions were not directed to the ILC representatives.

The County offers no authority for its argument that a non-attorney representative must

testify at the hearing, and such a claim is inconsistent with the plain meaning of the Zoning Procedures and ZBA Rules of Procedure. Neither the Zoning Procedures nor the ZBA Rules of Procedure state that a petitioner must testify. The Zoning Procedures do not even require that a petitioner be present at the hearing, but instead require the attendance of Petitioner or agent. (Zoning Procedures at 4) (emphasis added). Nothing suggests that an attorney cannot serve as a petitioner's agent. Further, ZBA Rule of Procedure 4.1(c) provides that "[t]he Board will first hear statements from the petitioner or his attorney and/or witnesses." (emphasis added). The County suggests that this Rule means only that the petitioner must proceed first. That suggestion would be persuasive only if the Rule read "petitioner and his attorney and/or witnesses."

The Zoning Procedures do state that "[p]etitioner *should* be prepared to answer questions from the Zoning Board, staff, and members of the public." (*Id.*) (emphasis added). In this case, ILC representatives were present at the hearing and sworn in, and the ZBA was informed on the record that ILC representatives would answer questions, but none were posed. The County has asserted that the Board members failed to question the ILC representatives because the representatives had not first testified, and because Chairman Kartholl did not want to interrupt Day's presentation. (Def.'s Mem. at 9.) Neither the County Zoning Procedures nor the ZBA Rules of Procedure require a witness who has been sworn to make a statement on the record before members of the Board or the public can ask that individual a question, however. The County cites ZBA Rule of Procedure 4.1(l), which states "[a]ny member of the Zoning Board of Appeals may ask a questions of any person giving testimony at the public hearing," but this Rule is permissive, not restrictive. Moreover, as the court reads Section 4.1, Rule 4.1(l) refers to Rules 4.1(g) and (h), in the same way that 4.1(d) refers to 4.1(c). ZBA Rule of Procedure 4.1(d) provides that "upon completion of the petitioner's presentation [which pursuant to Rule 4.1(c) consists of statements by "petitioner or his attorney and/or witnesses"], the members of the Zoning Board of Appeals and staff may ask questions." This rule places no restriction on who among the petitioner's

50

representatives the ZBA members may question, and says nothing about questioning only those who have first testified. Rules 4.1(g) and (h) permit statements and testimony in support of, and opposition to, the petition by other parties. ZBA Rule of Procedure 4.1(I) permits the ZBA members to question these other persons who have testified in support of or opposition to the petition.

Further, Chairman Kartholl's purported concern about interrupting Day's presentation is unconvincing. As explained above, ZBA Rules of Procedure 4.1(d) and (e) call for questions from the Board and the public to occur after the petitioner's presentation has concluded. (ZBA Rules of Procedure 4.1(c), (d), (e).) And Chairman Kartholl's explanations for his conduct at the ILC hearing are belied by his conduct at other ZBA hearings in which Chairman Kartholl has both interrupted the zoning attorney's presentation and questioned petitioner representatives who have not first offered testimony. At the first of two hearings on Naperville Korean First Presbyterian's Conditional Use Permit, the Church's zoning attorney testified on behalf of the Church, and Chairman Kartholl recognized the attorney's right to testify as "an officer of the court." (Naperville Korean ZBA Hr'g Tr. at 7.) A Church representative who was present at the hearing testified only after Chairman Kartholl began asking him specific questions regarding the Church's operations. (*Id.* at 13.) At the ZBA hearing for New Day's Conditional Use Application, an attorney presented testimony on behalf of the petitioner and Chairman Kartholl interrupted the attorney's presentation to question the day care operator before she had offered any testimony. (New Day Hr'g Tr. at 12-65.) The day care operator was subsequently subjected to extensive questioning by several of the ZBA members. (*Id.*)

To sum up: the County claims that ILC did not tender any witnesses in support of its Application, did not present any verbal testimony relative to its exhibits, and that Day's testimony "did not represent testimony on behalf of [ILC]," but these claims appear both arbitrary and capricious. (Pl.'s 56.1 Stmt. ¶¶ 57-58; Sept. 10, 2009 ZBA Memo to CDC.) Moreover, to the extent that the Objectors' due process rights were violated by a lack of cross examination, that violation

was caused by the County, not ILC.

### 2. The ZBA's Findings

ILC further argues that the County's denial of its Application was arbitrary and capricious because the County relied upon erroneous and speculative findings. (Pl.'s Mem. at 9.) Specifically, the County found that ILC had not demonstrated that its proposed use was "in harmony with the general purpose and intent of the Zoning Ordinance, and will not be injurious to the neighborhood, detrimental to the public welfare, or in conflict with the County's comprehensive plan for development." This finding was based on ILC's alleged failure to demonstrate that its proposed use was for a religious institution. (Irshad Ordinance at 6.) The court agrees with ILC that this finding lacks support in the record.

Although the County Zoning Ordinance does not specifically define "religious institutions," the Zoning Ordinance identifies "[c]hapels, churches, synagogues, temples and other religious institutions including parsonages and rectories" as Conditional Uses in the several residential zoning districts, including the R-1 district. (County Zoning Ordinance § 37-701.2.) ILC's Application was for a Conditional Use to operate a "religious institution." (Pl.'s 56.1 Resp. ¶ 31.) ILC's Application requested use of the property to hold regular religious services on Thursday evenings, and religious education classes. (Zoning Request at 2.) ILC also sought to conduct occasional "religious holiday events" (Feb. 26, 2009 ZBA Hr'g Tr. at 25), and "special events" including regular services associated with weddings, funerals, and congregational meetings. (*Id.* at 26-27.) The ZBA's findings state that ILC had not established that its principal use was religious because some of the activities ILC sought to conduct can be characterized as social, cultural, or educational, and because there is a swimming pool on the property. (Irshad Ordinance at 13.) The County has not cited and the court has not located any authority in support of such a conclusion, a finding which appears to be arbitrary and capricious.

The County defends its remaining findings by claiming that ILC failed to establish the precise nature and intensity of its proposed use and insists its denial was justified because of "conflicting evidence regarding the Plaintiff's planned use, and the absence of evidence that the zoning conditions discussed were adequate." (Def.'s Mem. at 9-12; Def.'s Resp. at 3-4.) Specifically, the County claims that the evidence presented showed that the number of people who would attend ILC events greatly exceeded what ILC represented in its zoning Application. (Def.'s Resp. at 4.)

The County's assertion that ILC's Application states no "specific occupancy limits" is particularly puzzling. (Def.'s Mem. at 9.) The Conditional Use Application explicitly limited occupancy to 100 worshipers, and ILC provided testimony and documentation (specific references to that testimony and documentation are not included in the June 4, 2009 ZBA Flyer Sheet) that attendance would be actually peak at seventy worshipers, or up to eight-five students and staff. The Application proposed a 100-person maximum for the main worship area. (Zoning Request at 3.) The largest number of occupants for any event described in the Application or Day's testimony was eighty-five students plus staff for the summer program. (Feb. 26, 2009 ZBA Hr'g Tr. at 29-30.) Although ILC did not offer exact attendance figures for every activity it wished to conduct on the property, it repeatedly confirmed that it would operate within the 100 person limit on occupancy. Regarding the size of the proposed summer program, Day acknowledged that regardless of the success of the program, there would "be a physical limit to this facility set by the County." (Id. at 30.) ILC also reiterated that its request was limited to a maximum occupancy of 100 worshipers in its Rebuttal Submittal (Rebuttal at 10-11), at the May 14, 2009 ZBA Hearing (May 14, 2009 ZBA Hr'g Tr. at 19), and in a July 2, 2007 letter to the CDC. (July 2, 2009 Letter to CDC at 1-4.) Further, one of the twelve conditions in the Amended Application approved by the CDC in October of 2009 restricted occupancy to 100 persons. (Pl.'s 56.1 Stmt. ¶ 62.)

The County nevertheless expresses concern that ILC's "proposed use was not in any way

limited to activities having one hundred persons" and that ILC "did not indicate that events having attendance greater than one hundred persons would be conducted elsewhere." (Def.'s Mem. at 10.) To the contrary, the record clearly shows that ILC's proposed use was limited to 100 persons, and, as such, there was no need for ILC to specify that it would conduct larger events elsewhere. On this record, the conclusions expressed by the ZBA regarding "the number of patrons using the facility, time of use and intensity of use" (June 4, 2009 ZBA Flyer Sheet at 20) appear to be based upon a serious misapprehension of the record and improper speculation.

In *Westchester Day Sch.*, the zoning board of appeals had rejected an Orthodox Jewish day school's proposal for an expansion that would enable it to serve the existing school population. The court found a substantial burden on religious exercise, in part because "the ZBA impermissibly based its decision on speculation about future expansion, without a basis in fact." 504 F.3d at 351. For example, the ZBA speculated that the plan included an expansion of the number of high school students, which raised traffic and pedestrian safety concerns, when in fact no high school expansion had been proposed. *Westchester Day Sch. v. Village of Mamaroneck*, 417 F.Supp.2d 477, 538 (S.D.N.Y. 2006). In affirming the district court's findings, the Second Circuit observed that the ZBA exhibited an "arbitrary blindness to the facts." 504 F.3d at 352. Although the ZBA could have required the school to accept "conditions intended to mitigate adverse effects on public health, safely, and welfare, . . . the ZBA chose instead to deny the application in its entirety." *Id.*

Attempting to distinguish *Westchester*, the County argues that the denial of ILC's application was not based on speculation "about how the property might be used in the future," but instead "contradictions between the Plaintiff's vague evidence of the intensity of its proposed use and the Objectors' evidence concerning the intensity of the Plaintiff's activities at its rented sites." (Def.'s Resp. at 6.) The County insists that "the ZBA did not consider a 'speculative future use' [citation omitted] but, rather, considered the exact use that the Plaintiff proposed, to wit, that Plaintiff's activities at several rented facilities would be moved to the Subject Property." (Def.'s

Mem. at 20.) As the court understands this argument, it makes sense only if one believes, as the County insists, that ILC sought to move "all of their current activities" to the subject property. (Def.'s Mem. at 9-10, 19-20.) The County is correct that there is evidence that ILC has conducted several events at its rented sites that exceeded 100 attendees, but the County misreads and misquotes Day's testimony when it claims that ILC proposed to move "all of their current activities" to the subject property.[18] (Def.'s Mem. at 9-10, 19-20.) No such statement was ever made.

The record establishes that ILC never requested authority to conduct activities or hold events involving more than 100 people at the subject property. The ZBA's finding that the evidence supported the "Objectors' version of how intensely the Subject Property would be used" (Def.'s Resp. at 6) appears to be the product of the speculation and/or factual errors discussed above. Findings based upon speculation suggest arbitrariness on the part of the County Board and ZBA–after all, the County retains power to impose specific conditions upon which a Conditional Use Permit is granted and to take enforcement actions if those conditions are not being met. *See* DuPage County Code 37-1413.10 ("The county board may establish such conditions and restrictions upon the . . . operation of the conditional use as is deemed necessary for the protection of the public interest."); 37-1417 (setting out procedures for addressing violations of a conditional use permit, including fines of up to $500 per day). The evidence that the County Board and ZBA did not consider the Application as it was submitted, but rather speculated regarding future use, suggests that, as in *Guru Nanak*, there is a question as to whether Plaintiff will ever be able to use its property as a religious institution. *See Guru Nanak*, 456 F.3d at 992.

---

[18]     For this quotation Defendant cites to Paragraph 39 of its Rule 56.1(a) submission, which in turn cites to page 24 of the February 26, 2009 ZBA hearing transcript. The phrase "all of their current activities" does not appear anywhere in transcript. The page to which Defendant cites contains a sentence reading, "First of all, their current activities include two very regular weekly meetings." (Feb. 26, 2009 ZBA Hr'g Tr. at 24:6-7.) (emphasis added).

### 3. The County's refusal to accept or impose mitigating conditions

Plaintiff alleges that neither the County Board nor the ZBA deliberated on the additional conditions Plaintiff accepted after the November 5 meeting. (Pl.'s Compl. ¶¶ 107-112, 122.) Plaintiff suggests it was willing to modify its proposal further in response to recommendations from County officials, County Board members, and ZBA members, but was not allowed the opportunity to do so. (*Id.*) The County claims that ILC failed to bring mitigating conditions to the ZBA's attention. (Def.'s Mem. at 18.) Here again, the record does not support the County's position. To the contrary, ILC submitted an Amended Application which included twelve conditions in October 2009. (Pl.'s 56.1 Stmt. ¶ 62.) Additionally, ILC representatives met with Member Michelassi and Objectors on November 5, 2009 to facilitate a compromise. (Pl.'s 56.1 Resp. ¶ 80.) Six additional conditions were placed on ILC's Application based on recommendations by County Board Member Jim Healy. (Pl.'s 56.1 Stmt. ¶ 63.) ILC developed alternative site plans in accordance with the changes, and an alternative plan was submitted to County zoning staff on November 9, 2009. (*Id.* ¶ 64.) At the December 7, 2009 ZBA hearing, ILC's zoning attorney reiterated the limits of ILC's request, again assured the ZBA of ILC's willingness to comply with all applicable codes, and confirmed that ILC would accept all the conditions except the maximum twenty-seven parking spaces. (Dec. 7, 2009 ZBA Hr'g Tr. at 30-34.) The ZBA did not recommend a single condition to alleviate its purported concerns with ILC's proposed use.

Evidence that a religious organization "readily agreed to every mitigation measure suggested . . . but the County, without explanation, found such cooperation insufficient," supported the Ninth Circuit's conclusion that county officials imposed a substantial burden on a religious group. *See Guru Nanak*, 456 F.3d at 989. In *Guru Nanak*, the court went on to explain that in denying the application, the county's Board of Supervisors, "disregarded, without explanation" the county planning department's conclusion that with certain mitigating conditions, the proposed

temple would have a "less-than-significant impact on surrounding land uses." *Id.* at 991. In voting down the proposal, the Board did not explain why the proposed mitigating conditions were ineffective, nor did the Board propose alternatives. *Id.* The Ninth Circuit concluded that "[b]ecause the County's actions have to a significantly great extent lessened the prospect of Guru Nanak being able to construct a temple in the future, the County has imposed a substantial burden on Guru Nanak's religious exercise." *Id.* at 992. The Second Circuit made a similar observation, noting that a procedure allowing a religious institution to propose modified conditions would militate against the conclusion that regulations impose a substantial burden on religious exercise. *Westchester Day Sch.*, 504 F.3d at 349. The County here argues that it was unable to determine which, if any, conditions might mitigate adverse effects on adjoining properties. (Def.'s Mem. at 2.) This inability resulted from "uncertainty" regarding ILC's proposed use, the County asserts (Def.'s Resp. at 13), again criticizing ILC's reliance on testimony of counsel rather than ILC's directors. (Def.'s Resp. at 5, 7.) Again, any purported uncertainty regarding ILC's proposed use and how it could conduct its activities within the conditions placed on its proposed use appears to rest on an unsupported assumption that ILC would exceed its proposed use.

ILC alleges that the "delay, uncertainty, and expense" that have accompanied its efforts to gain approval of its Conditional Use Application impose a substantial burden. *Sts. Constantine and Helen*, 396 F.3d at 901 (holding that such factors may constitute a substantial burden). Importantly, the Seventh Circuit has noted that "substantiality is a relative term—whether a given burden is substantial depends on its magnitude in relation to the needs and resources of the religious organization in question." *World Outreach Conference Ctr. v. City of Chicago*, 591 F.3d 531, 539 (7th Cir. 2009). Though the particular circumstances of *Sts. Constantine and Helen* differ from those alleged here, it is significant that in that case, as in this one, the religious institution had expressed a willingness to meet the demands of both the professional planning staff and elected officials, but had seen its request rebuffed nonetheless. In this case, all of the ZBA findings relied

upon to deny ILC's Application are based in whole or in part on erroneous findings or impermissible speculation. The County's repeated errors, speculation, and refusal to impose conditions support an inference that the County subjected ILC to a substantial burden. *See Sts. Constantine and Helen* 396 F.3d at 899-901. Such a burden on religious exercise, including that of a religious assembly or institution, must be justified by a "compelling governmental interest and that it has utilized the least restrictive means of doing so." 42 U.S.C. § 2000cc(a)(1). The County has not argued that its decision to deny ILC's Conditional Use was justified by a compelling government interest. Because the County bears "the burden of persuasion," 42 U.S.C. § 2000cc–2(b), to prove narrowly tailored, compelling interests, Defendant's motion for summary judgment is denied as to Count II. Plaintiff's motion for summary judgment on Count II is granted.

### B.   Illinois Religious Freedom Restoration Act

The RFRA has an essentially identical provision to RLUIPA's substantial burden provision. 775 ILCS 35/15. "The Illinois law . . . [is] materially identical to section (a)(1) of the federal law, and so it need not be discussed separately." *World Outreach*, 591 F.3d at 533 (citations omitted). The court concludes that because Plaintiff is entitled to summary judgment pursuant to RLUIPA's substantial burden provision, it is also entitled to summary judgment under the parallel Illinois provision. Plaintiff's motion is granted on Count IX, and Defendant's motion is denied.

## IV.   Counts III and X

Both parties have also moved for summary judgment on ILC's claims under the Free Exercise Clauses of the United States Constitution and the Illinois Constitution. ILC argues that it is entitled to summary judgment on Counts III and X because Defendant substantially burdened its free exercise and has not presented a narrowly tailored compelling government interest justifying the burden. (Pl.'s Mem. at 14.) The First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]. "While the right of free exercise does not relieve an

individual of the obligation to comply with a valid and neutral law of general applicability," *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990), "[o]fficial action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). The government must not "regulate[] or prohibit[] conduct because it is undertaken for religious reasons," *id.* at 532, but may do so "in spite of" such beliefs. *Id.* at 540. Free Exercise claims brought pursuant to the Illinois Constitution are analyzed "using standards from federally-derived free exercise jurisprudence." *C.L.U.B. v. City of Chicago*, No. 94 C 6151, 1996 WL 89241, at *22 (N.D. Ill. Feb. 27, 1996) (collecting cases).

ILC does not allege that DuPage County's zoning ordinances facially impede its free exercise of religion, but rather argues that by their conduct, the County Board and ZBA have done so. The Seventh Circuit recently noted that "[i]f a state or local government deliberately discriminated against a religious organization (or against religion in general), it would be violating the free exercise clause even if the burden that the discrimination imposed on the plaintiff was not 'substantial' within the meaning of RLUIPA." *World Outreach*, 591 F.3d at 534. The Seventh Circuit has explained, further, that even without a showing of deliberate discrimination, a religious organization can establish a violation of the Free Exercise Clause where it shows that "the government . . . [has placed] a substantial burden on the observation of a central religious belief or practice without first demonstrating that a compelling governmental interest justifies the burden." *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 631 (7th Cir. 2007) (citations and quotations committed).

As explained earlier, ILC has not advanced direct evidence of deliberate discrimination on the part of County officials and employees. The court has concluded, however, that the County's denial of ILC's Application was arbitrary and capricious, and thus, the County imposed a substantial burden on ILC. Therefore, ILC has shown a violation of the Free Exercise Clause unless the

County can "demonstrate that a compelling governmental interest justifies the burden." *St. John's United*, 502 F.3d at 631. Because the County has not argued that the burden imposed was justified by a compelling interest, the court grants summary judgment in favor of Plaintiff and against Defendant on Counts III and X.

## V.    Count VII *De Novo* Legislative Review

In Count VII, ILC requests *de novo* review of the County Board's decision to deny its Conditional Use Application. Both parties now seek summary judgment.

Pursuant to 55 ILCS 5/5-12012.1, the denial of a special use permit is subject to "de novo review as a legislative decision." 55 ILCS 5/5-12012.1(a) Review under Section 5–12012.1 "may be nominally 'de novo' and may allow for presentation of new evidence, but is actually much less searching than the administrative review the statute curtails." *Millineum Maint. Mgmt., Inc. v. County of Lake*, 384 Ill. App. 3d 638, 653, 894 N.E.2d 845, 861 (2d Dist. 2008). There is a presumption of validity in favor of the action taken by County. *Family Christian Fellowship v. Winnebago Cnty.*, 151 Ill. App. 3d 616, 619, 503 N.E.2d 367, 370 (2d Dist. 1986). "This presumption is not overcome unless the property owner shows by clear and convincing evidence that the ordinance as applied to him is arbitrary and unreasonable and bears no substantial relation to the public health, safety and welfare." (*Id.*) This presumption, however, is "significantly diminished" when the zoning decision "in some way limits the free exercise of religion." (*Id.*) "The right of freedom of religion and other first amendment freedoms rise above mere property rights and far outweigh considerations of public inconvenience, annoyance or unrest." *Family Christian*, 151 Ill. App. 3d at 619, 503 N.E.2d at 370 (citing *Columbus Park Congregation of Jehovah's Witnesses, Inc. v. Board of Appeals*, 25 Ill. 2d 65, 71-72, 182 N.E.2d 722, 725 (Ill. 1962); *Lubavitch Chabad House of Illinois, Inc. v. City of Evanston*, 112 Ill. App. 3d 223, 227, 445 N.E.2d 343, 347 (3rd Dist. 1982).

The court reviews the administrative body's decision "for arbitrariness as a matter of substantive due process." *Millineum Maint.*, 384 Ill. App. 3d at 652, 894 N.E.2d at 860 (quoting *Living Word*, 196 Ill. 2d at 14, 749 N.E.2d at 916). Arbitrariness as a matter of substantive due process is normally evaluated in light of the six factors set forth in *LaSalle National Bank v. County of Cook*, 12 Ill. 2d 40, 145 N.E.2d 65 (Ill. 1957). *See Living Word*, 196 Ill. 2d at 15, 749 N.E.2d at 925; see also *Family Christian*, 151 Ill. App. 3d at 619-20, 503 N.E.2d at 370. The *LaSalle* factors that may be considered when determining validity of a zoning decision are: 1) the existing uses of property in the general area; 2) the existing zoning classification of property; 3) the suitability of the subject property for the uses permitted under the zoning classification; 4) the trend of development of the property in the general area; 5) the length of time the property has been vacant as zoned; and 6) the extent to which the property's value is diminished by the existing zoning classification. *LaSalle*, 12 Ill. 2d at 46-47, 145 N.E.2d at 69. Courts also consider the compatibility of the proposed use with an existing comprehensive plan. *See Family Christian*, 151 Ill. App. 3d at 619, 503 N.E.2d at 370. The landholder's compliance with any special use criteria listed in the zoning ordinance, while not necessarily dispositive, is also a factor to consider. *Living Word*, 196 Ill. 2d at 14, 749 N.E.2d at 925; see also *National Pride Equip., Inc. v. Village of Niles*, 109 Ill. App. 3d 639, 644–45, 440 N.E.2d 1053, 1057 (1st Dist.1982). No single factor is controlling.[19] *Family Christian*, 151 Ill. App. 3d at 619, 503 N.E.2d at 370 (citing *LaSalle*, 12 Ill. 2d at 47-48, 145 N.E.2d at 69).

_____

[19] *LaSalle* factors 1, 2, 3, 4, and 6 are not relevant here. ILC has not challenged the County Zoning Ordinance or the property's zoning classification. Further, ILC's proposed use is a special use within the property's zoning classification, thus the County has made a legislative finding that ILC's proposed use is "in harmony with the general zoning plan and will not adversely affect the neighborhood." 196 Ill.2d at 17, 749 N.E.2d at 927. There is little evidence in the record concerning factor 5. ILC purchased the property in March 2008 (Pl.'s 56.1 Stmt. ¶ 8), and as such, when the County Board denied ILC's Application, the property had been unused for at least fourteen months. There is no evidence in the record establishing how long the property may have been unused or vacant prior to ILC's purchase in March 2008.

DuPage County Zoning Ordinance Section 37-1413.5.A states that a Conditional Use may be granted if it "is in harmony with the general purpose and intent of the of [the Zoning Ordinance], and will not be injurious to the neighborhood, detrimental to the public welfare, or in conflict with the County's Comprehensive Plan for Development . . . ." Further, the County Zoning Ordinance permits a religious institution as a Conditional Use in the zoning district in which ILC's property is located. *See* County Zoning Ordinance § 37-701.2. Such a recognition within a zoning ordinance "is tantamount to a legislative finding that the permitted use is in harmony with the general zoning plan and will not adversely affect the neighborhood." *Living Word*, 196. Ill.2d at 17, 749 N.E.2d at 927. The Illinois Supreme Court explained that such a finding limits the circumstances in which a special use[20] permit should be denied:

> Because special uses, as such, are considered compatible with other uses in the zoning district in which they are included, it is generally held that an application for a special use permit may not be denied on the ground that the use is not in harmony with the surrounding neighborhood. Instead, a special use permit "must be denied when it is determined from the facts and circumstances that the grant of the requested special exception use would result in an adverse effect upon adjoining and surrounding properties unique and different from the adverse effect that would otherwise result from the development of such a special exception use located anywhere within the zone. Thus, . . . the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any adverse effects above and beyond those inherently associated with such a special exception use irrespective of its location within the zone.

*Living Word*, 196. Ill.2d at 21-22, 749 N.E.2d at 929. Acting administratively, the County is bound by its Zoning Ordinance, and not the Comprehensive Plan, and thus, the County may not rely on its Comprehensive Plan to justify the decision to deny an application where the proposed use is

---

[20]   "[A] 'special use' is a type of property use that is expressly permitted within a zoning district by the controlling zoning ordinance so long as the use meets certain criteria or conditions. 'The purpose of special uses is to provide for those uses that are either necessary or generally appropriate for a community but may require special regulation because of unique or unusual impacts associated with them.'" *Living Word*, 196 Ill. 2d at 16, 749 N.E.2d at 926 (2001) (quoting S. Connor, *Zoning,* in Municipal Law & Practice § 13.17 (Ill. Inst. for Cont. Legal Educ. 2000).

recognized as a Conditional Use by the Zoning Ordinance. 196 Ill.2d at 23, 749 N.E.2d at 930.

**Compliance With Applicable Zoning Criteria**

In light of the foregoing, in assessing whether the County Board's denial of ILC's Application was against the manifest weight of the evidence, the courts aks whether there is evidence that ILC's proposed use at the particular location proposed would have any adverse effects above and beyond those inherently associated with such a special exception use, irrespective of its location within the zone. That is, did the County have evidence that ILC's particular use of the property would be injurious to the neighborhood, detrimental to the public welfare, or otherwise fail to comply with special use criteria listed in the Zoning Ordinance? Zoning Ordinance § 37-141.5.A. Section 37-1413.5.A specifies that a proposed conditional use must not: 1) impair an adequate supply of light and air to adjacent property; 2) increase the hazard from fire or other dangers to property; 3) diminish the value of land and buildings in the vicinity of the proposed conditional use; 4) unduly increase traffic congestion in the public streets and highways; 5) increase the potential for flood damages to adjacent property; 6) incur additional public expense for fire protection, rescue, or relief; or 7) otherwise impair the public health, safety, comfort, or morals, or general welfare of the County's inhabitants, and that the use will not create a nuisance. The court addresses those factors briefly below.

A.      **Impact on Adequate Supply of Light or Air to Adjacent Property**

ILC's proposed use does not call for the addition of any new structures or any changes to the existing structures on the property, which the County has already found satisfy the first standard of no undue impairment to light and air to adjacent properties. Both parties' experts agree that ILC appears to have met this standard. (Maiden Report [87-8, 87-9, 87-10, 87-11, 87-12], Ex. HHH to Pl.'s Mot., at 2; Houseal Report [87-13], Ex. III to Pl.'s Mot., at 4.) Further, the ZBA did not make a specific finding related to this standard and the County presented no such argument. There is no evidence to support a denial based on this factor.

## B.   Impact on Hazard from Fire or Other Dangers to Property

Again, ILC has not proposed to alter any of the structures on the property. According to the Balkwill Ordinance, the Subject Property will not increase hazard from fire or other dangers to the property, because "the Balkwills are not doing any new construction at the site and all structures on the property currently meet all other building and fire codes." (Pl.'s 56.1 Stmt. ¶19.) All of the pertinent government divisions which reviewed ILC's proposal, including the Naperville Fire Department, presented no objections to the ZBA. Both parties' experts agree that ILC appears to have met this standard. (Maiden Report at 2; Houseal Report at 4.) Finally, the ZBA did not make a specific finding related to this standard and the County presented no such argument. There is no evidence to support a denial based on this factor.

## C.   Impact on Value of Land and Buildings in the Vicinity

Objectors on several occasions raised concerns that ILC's proposed use would diminish their property values. ILC points out that when the County previously determined that the Balkwill School would not diminish the value of land and buildings in the vicinity, the County noted only that "the structures on the property meet all other building codes." (Pl.'s 56.1 Stmt. ¶ 20.) ILC reasons that since no pertinent government divisions objected to its proposal, ILC's proposed use meets the same requirements applied to the Balkwills' Conditional Use under the third standard of the Zoning Ordinance. The court, however, must consider "the particular use proposed at the particular location." *Living Word*, 196 Ill.2d at 22, 749 N.E.2d at 929. The Objectors' concerns regarding property values do not concern the structure on the property. Rather, the Objectors' concerns stem from the uses ILC sought for the property, specifically, disturbances such as noise and light pollution. The Objectors were also concerned that a significant amount of green space on the property would be covered with asphalt to accommodate additional parking. Objectors speculated that ILC's proposed used would diminish their property values; however, no competent

evidence substantiating these concerns was presented during any of the zoning proceedings, nor did the ZBA make any specific findings to that effect.

There are five other religious institutions within approximately a half-mile radius of the Subject Property. (Pl.'s 56.1 Stmt. ¶ 12.) ILC's activities will remain in a self-contained area, with traffic entering and exiting from 75th Street, not from the residential streets which provide access to the adjacent homes. (Pl.'s 56.1 Stmt. ¶¶ 10-11; see Maiden Report at 3.) Further, ILC's expert witness found ILC's proposal to be compatible with residential uses in the area, thus not diminishing the value of land and buildings in the vicinity. (Maiden Report at 3-4.) The County's expert witness states that ILC's proposed use would result in a "destruction of property values" because the intensity and hours of ILC's proposed use are incompatible with the residential use of adjacent properties. (Houseal Report at 4-5.) The County's expert does not specify the extent to which ILC's proposed use might affect property values. This is significant because evidence of diminution in value of nearby property does not necessarily preclude a proposed use. *Family Christian*, 151 Ill. App. 3d at 620, 503 N.E.2d at 371. Neither does the County's expert offer any facts or data in support of his conclusion. Denial of a proposed use involving the fundamental right to free exercise of religion is not warranted based on inconclusive evidence of the effect on adjacent property values. *Family Christian*, 151 Ill. App. 3d at 620, 503 N.E.2d at 371 (finding testimony as to diminution of value of nearby residences to be insufficient to support denial of permit); see also *Columbus Park*, 25 Ill.2d 175 , 182 N.E.2d 726 (finding argument of detrimental effect on business insufficient). In the present case, the lack of such evidence compels the court to conclude that denial of ILC's Application based upon this factor would be improperly speculative.

**D.    Impact on Traffic Congestion**

The Transportation Department and the Lisle Township Highway Commissioner did not object to ILC's proposal. More importantly, the ZBA's June 4, 2009 findings state that ILC's use will not cause traffic congestion in the surrounding subdivisions because the subdivisions do not

have access to ILC's property; there is no finding regarding traffic on 75th Street. (June 4, 2009 ZBA Flyer Sheet at 9.) The only vehicular access to Plaintiff's property is from the outside west-bound lane of 75th Street, which is a four-lane divided highway. According to 2007 Illinois Department of Transportation traffic counts, 75th Street serves an average of 35,600 vehicles daily. (Zoning Request at 2.) ILC's expert concluded that the traffic generated by ILC's proposed use "will be insignificant to the volume of traffic and design level that already exists for 75th Street." (Maiden Report at 4.) The County's expert concludes that ILC's proposed use may cause traffic to back up out of the parking lot. (Houseal Report at 5.) This conclusion, however, is premised in part on the impermissibly speculative assertion that ILC "failed to demonstrate that the limit of 100 people per service is realistic or accurate." (*Id*.) Thus, ILC's Application could not be reasonably denied based on the fourth standard.

### E.     Potential for Flood Damages to Adjacent Property

The DuPage County Stormwater Division reviewed ILC's Application and expressed no concerns. The County Stormwater Permitting Manager recommended approval on behalf of the Stormwater Division of the Department of Economic Development. (Rebuttal at 10.) Further, county staff confirmed that ILC would have a drainage review when securing the building permit for the parking lot. (June 4, 2009 ZBA Flyer Sheet at 9.) The parties' experts disagree concerning whether ILC's proposed use, particularly the paving required for the additional parking spaces, will increase the risk of flood damage to neighboring properties. (Maiden Report at 4-5; Houseal Report at 5.) Neither the County nor its expert made a finding or offered any evidence that the paving would in fact increase flood risk. Instead, the County and its expert merely state that ILC has not offered evidence that it would not. (*See* Houseal Report at 5.) The County has not explained why, in this case, it chose not to defer to the staff in the Stormwater Division who had no concerns, as it did when addressing Naperville Korean First Presbyterian's parking lot expansion. (Apr. 19, 2007 Naperville Korean Hr'g Tr. at 36:2-38:11.) ILC's expert stated that the

County regularly approves conditional use applications with conditions to address concerns regarding drainage. (Maiden Report at 5-6.) Further, the County has cited no reason why it could not simply have conditioned approval on completion of the drainage review and compliance with all applicable codes. Because there is no evidence that potential additional drainage problems caused by ILC's proposed use could not have been controlled, the Conditional Use permit should not have been denied on this basis. *Family Christian*, 151 Ill. App. 3d at 623, 503 N.E.2d at 372.

### F.     Additional Public Expense for Fire Protection, Rescue, or Relief

There is no evidence that additional public expense will result from ILC's religious use of the property. The Naperville Fire Department did not raise objections to ILC's proposed use, and the County was advised that the property would be inspected by the department. (Pl.'s 56.1 Stmt. ¶ 31.) ILC's expert witness found that ILC's proposed use was consistent with this standard because its use would not increase facilities or capacity on the site, nor unduly impact access conditions to the site. (Maiden Report at 5.) The County's expert disagrees. He does not conclude, however, that ILC's proposed use will incur any additional expenses for fire and rescue relief. (Houseal Report at 5.) Instead, he suggests only that ILC's use could cause "increased difficulty gaining access to the building and activity areas" for emergency vehicles and personnel. (*Id.*) This conclusion appears to be based on unfounded concerns regarding increased congestion and traffic problems on 75th Street discussed above. (*Id.*) Thus, there is no basis to deny ILC's Application based on the fourth standard.

### G.     Impact on the Public Health, Safety, Comfort, or General Welfare

A Conditional Use must not impair the public health, safety, comfort, moral, or general welfare of the inhabitants of neighboring residences or otherwise create a nuisance. Zoning Ordinance § 37-141.5.A.7 Regarding health, safety, morals and general welfare concerns, the main objections of nearby residents were to noise and light pollution caused by the larger number of people and vehicles that will be on the property in the evening hours. As explained earlier, ILC's

proposed use would have a greater impact on the surrounding neighborhood than the use approved for the Balkwill School. The additional impact could conceivably affect public health, safety, comfort, or general welfare of the inhabitants of neighboring residences or otherwise create a nuisance. It is not enough, however, that a proposed use have a greater impact than a previous use, or a greater impact than neighboring uses. In the present case, there must be evidence that ILC's use would have "adverse effects above and beyond those inherently associated with such a special exception use *irrespective of its location within the zone.*" *Living Word*, 196. Ill.2d at 21-22, 749 N.E.2d at 929. (emphasis added). Further, this evidence must be substantial because "[t]he right of freedom of religion and other first amendment freedoms rise above mere property rights and far outweigh considerations of public inconvenience, annoyance or unrest." *Family Christian*, 151 Ill. App. 3d at 619, 503 N.E.2d at 370, citing *Columbus Park Congregation of Jehovah's Witnesses, Inc. v. Board of Appeals*, 25 Ill. 2d 65, 71-72, 182 N.E.2d 722, 725 (Ill. 1962); *Lubavitch Chabad House of Illinois, Inc. v. City of Evanston*, 112 Ill. App. 3d 223, 227, 445 N.E.2d 343, 347 (Ill. App. 3rd Dist. 1982).

The County has presented no evidence that ILC's proposed use would have effects above and beyond other religious institutions located in the zone. There is no evidence that ILC's proposed occupancy, the number of parking spaces it sought, or any other aspect of its proposal exceeded limits in the applicable codes and regulations. Further, there is no evidence that ILC's proposed use is more extensive than other religious uses in the zone. To the contrary, ILC has presented evidence that its use is less significant than other religious uses in the area. ILC seeks to conduct services for up to 100 worshipers on a 2.9-acre site with twenty-seven to thirty-nine parking spaces. ILC's Rebuttal notes that Our Saviour's Lutheran Church, located nearby in Naperville, sits on a 3.6 acre plot and has 4,500 members, a worship capacity of 520, and 258 parking spaces. (Rebuttal at 11.) Naperville Korean First Presbyterian Church sits on a 4.2-acre, which like ILC's property, is zoned R-1, single family residential. (Naperville Korean Ordinance.)

Its main worship area accommodates 450 people, it has 201 parking spaces, and its membership exceeds its worship capacity. (Naperville Korean ZBA Hr'g Tr. At 5-6, 41-42.) ILC also identified examples of religious institutions in the area that conduct evening and nighttime activities, and ILC's Rebuttal notes Conditional Use permits granted by the County for four other religious institutions within a mile of ILC's property, none of which included a time limitation. (Pl's 56.1 Stmt. ¶¶ 95-100.) Instead, the County's findings that ILC's proposed use was too intense for the property and would have adverse effects on the neighboring properties was based on speculation that ILC would exceed its proposed use. Further, the County's apparent inability to recommend or agree to conditions that might mitigate ILC's impact on the surrounding area was based on a claimed ignorance regarding the true extent of ILC's intended use of the property. The court finds no evidence justifying outright denial of ILC's Conditional Use based on this factor.

For the foregoing reasons, the court reverses the County Board's decision denying ILC's Conditional Use Application and remands the cause to the County Board. The court anticipates that, absent a material change in the circumstances, the Board will order the issuance of ILC's Conditional Use Permit with the twelve conditions approved by the CDC on October 20, 2009, with the exception of the condition restricting the number of parking spaces to twenty-seven, and also adding the six additional conditions developed out of the November 5, 2009 informal meeting and proposed by CDC Chair Michelassi at the November 10, 2009 County Board meeting.

**VI.    Count VIII Injunctive Relief**

Count VIII's request for injunctive relief is stricken as moot.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is granted as to Counts II, III, VII, IX, and X. Defendant's motion is granted to Counts I and V. Count VIII is stricken as moot.

ENTER:

Dated: March 29, 2013

REBECCA R. PALLMEYER
United States District Judge